**1813.**
**December.**

Partridge
vs
Dorsey

PARTRIDGE vs. DORSEY's Lessee.

ERROR to *Anne-Arundel* County Court. This was an action of ejectment for a tract of land called *Chew's Vineyard*, originally brought in the late general court, and on the abolition of that court transferred to the county court. The facts, as agreed upon, were these: *Caleb Dorsey*, being seized in fee of *Chew's Vineyard*, by his will, dated the 14th of *March* 1772, devised as follows: "As to my real estate, I give and devise unto my son *Samuel Dorsey*, and the heirs of his body lawfully begotten, my land called *Chew's Resolution Manor Resurveyed*, as also the land called *The Gore, Chew's Vineyard*, also one undivided moiety of my land in *Baltimore* county, called *Taylor's Forest*; and all that part," &c. "But in case my said son *Samuel Dorsey* is at this time married, or has disposed of himself in marriage to *Margaret* or *Peggy Sprigg*, or shall hereafter marry her, or dispose of himself in marriage to her, then I do hereby revoke, annul, and make absolutely void and of none effect, my said devise, legacy and bequest, to my said son *Samuel Dorsey* as aforesaid, except 500 acres of land lying in *Frederick* county, being part of *Caleb's Delight Enlarged*, all which my said lands and personal estate I do thenceforth and in such case give, devise and bequeath, unto my son *Edward Dorsey*, and the heirs of his body lawfully begotten, and for default of lawful issue, then to remain to my above named daughters, and their heirs, for ever." On the death of *Caleb Dorsey*, which happened shortly after the execution of his will, *Samuel Dorsey* entered into *Chew's Vineyard*, claiming the same under and by virtue of the said will, and became seized thereof as the law requires; and on the 2d day of *May* 1777, he entered into an agreement with

An heir or issue in tail, claiming *per formam doni*, is not compellable to fulfil a contract entered into by the tenant in tail, for a sale of the entailed land

The court of chancery has no authority to decree a specific execution of such a contract against the heir or issue in tail, the act of *November* 1773, *ch.* 7, extending only to cases where the heir was bound to fulfil the contract of his ancestor.

Where the court of chancery did so decree on a false representation of the facts, and the question, whether the heir in tail was bound to convey the land in completion of the contract, was not before the chancellor, nor could it arise in the case—Whether or not such decree, and the conveyance made pursuant thereto, do conclude the heir in tail, and operate to divest his right to the land? *Quere*

C D, by his will, devised to his son S, and his heirs in tail, certain lands, with the following restriction or proviso, "but in case my said son S is at this time married, or has disposed of himself in marriage to M S, or shall hereafter marry her, or dispose of himself in marriage to her, then I do hereby revoke, annul, and make absolutely void and of none effect, my said devise to my said son S as aforesaid, except 500 acres of land called," &c. "All which my said lands I do thenceforth, and in such case, give and devise to my son E, and the heirs of his body lawfully begotten; and for default of lawful issue, then to remain to my above named daughters, and their heirs, for ever." At the time C D made his will, his son S was married to M S; and after the death of C D., his son S petitioned the legislature to annul the restrictive clause in his father's will, the devisee over, an infant of 14 years, and the daughters of the testator, with the husbands of those that were married, joining in the petition; and "it appearing to the legislature that the marriage of S with M S, can be no disparagement," an act was passed declaring "that the said condition or restrictive clause shall be wholly void, and that the said will shall stand and be construed as if no such clause had been contained therein."—*Held*, by the county court, that the act of assembly was not void, but effectual and operative to annul the condition or restrictive clause subjoined to the devise to S in the will of C D.

The judges of the appellate court being divided in opinion, the judgment of the court below is affirmed.

The power and jurisdiction of the general assembly of *Maryland* in 1773, over all subjects of legislation within the limits of *Maryland*, were as great and transcendant as the power and jurisdiction of the parliament of *England*, within the scope of their authority. Per *Chase*, Ch. J.

John Wells to convey to him part of the said land, described by courses, &c. supposed to contain 350 acres, in consideration of the sum of £1000, to be paid when the said land should be conveyed, &c. if the part to be conveyed should contain more than 350 acres, then to be paid for in proportion, &c. *Samuel Dorsey* departed this life in the month of September 1777, intestate, and without having executed any deed to *John Wells* for the said parcel of land. At the time of his death, he left a son, *Edward Hill Dorsey*, the lessor of the plaintiff, who was a minor of the age of seven years, and who is the eldest son and heir at law of *Samuel Dorsey*. *John Wells*, on the 25th of January 1779, instituted a suit in the court of chancery against *Edward H. Dorsey*, the heir, and *Margaret Dorsey* the administratrix, of *Samuel Dorsey*, in which said suit the following proceedings were had: *The bill stated*, that *Samuel Dorsey*, deceased, became seized in fee, in his life time, of a tract of land called *Chew's Vineyard*, situate in *Anne Arundel* county, containing 950 acres, and on or about the 2d of May 1777, agreed to dispose of to the complainant 364 acres, part thereof, in consideration of £1040; and to perfect and ascertain the terms of the said contract, *Samuel Dorsey*, together with the complainant, made and executed the before mentioned agreement. That the complainant entered upon and took possession of the land, with the consent and in the presence of *Samuel Dorsey*, and had since cultivated, improved, and enclosed it. That the quantity is 364 acres, and the complainant became indebted therefor £1040. That he paid to *Dorsey*, in his life-time, £925. That *Dorsey* died in September 1777, *seized in fee* of the land, without having made any will, or without having executed any indenture, or other instrument of writing, to convey the said land to the complainant, as by the agreement *Dorsey* had obliged himself to do, and fully intended, (as he frequently told the complainant,) had he not been prevented by sudden death. That since *Dorsey's* death, letters of administration had been granted on his personal estate to *Margaret Dorsey*, his widow. That *Edward H. Dorsey*, an infant of tender years, to wit, of the age of seven years, or thereabouts, is heir at law to *Samuel Dorsey*, to whom the said parcel of land hath descended in *fee simple*. That the administratrix is well acquainted with the agreement, and of

the payments made, and has frequently expressed her willingness and desire to comply with the terms of the said agreement, and to convey the land to the complainant; but that the complainant had been advised that the said conveyance would be inefficient, and of no validity, on account of the minority of the heir at law of *Samuel Dorsey,* unless made and executed under the particular direction, and by the decree of the court of chancery. That being remediless unless by the interposition of the said court, &c. to the end that *Margaret* and *Edward* might true answers make, &c. that *Edward,* by his guardian, might be compelled to make over and convey the said land to the complainant, his heirs and assigns, agreeably to the contract aforesaid, &c. prayed a writ of subpœna, &c. The proceedings state, that a subpœna issued, returnable to February term 1779, at which time *Edward H. Dorsey* appeared in proper person; and *Margaret Dorsey* was appointed his guardian to answer and defend the suit, who being present, accepted, &c. and at the same term she exhibited her answer, as well for herself as for the said infant, stating that they did severally admit that *Samuel Dorsey,* in the bill mentioned, was seized in his life time of and in the said tract or parcel of land called *Chew's Vineyard,* and that he made the agreement, &c. That *Wells* entered upon the possession of the land, &c. That the quantity is correctly stated, and they believed the payment as stated was made, but that the sum of £132 8 2, or thereabouts, with interest, &c. was still due, which sum they believed the complainant would pay. They further admitted, that *Samuel Dorsey* departed this life in September 1777, *seized in fee* of the land aforesaid, without having made any deed of conveyance of the said land in pursuance of his said agreement, but they believed he fully intended to comply with the terms thereof had he not been prevented by a sudden death. That since the death of *Dorsey,* letters of administration had been granted to the said *Margaret,* who was his widow; and that the other defendant, *Edward H. Dorsey,* is an infant of tender years, and heir at law of the said *Samuel,* to whom the said tract or parcel of land descended in fee upon the death of his said father *Samuel.* That she was well acquainted with the transaction between the complainant and the said *Samuel,* and she had frequently

expressed a willingness to have the same settled agreeably
to the agreement, and was desirous that the land should be
conveyed to the complainant without further expense or
delay, as she was in want of the balance due on the pur-
chase, &c. to satisfy demands against the estate of her hus-
band; but they were advised, that any conveyance made
by them would be ineffectual, by reason of the minority of
the said *Edward*, unless made under sanction and by de-
cree of that honourable court. Therefore the defendant,
*Edward H. Dorsey*, being an infant of tender years, sub-
mits himself, by his guardian, to the judgment of the court,
and humbly hoped that his rights might be protected and
saved to him, &c. The following decree was passed by

1813.
Partridge
vs
Dorsey

ROGERS, Chancellor. "It appearing, upon due examinati-
on, that the said several facts contained in the complain-
ant's bill of complaint are true, and the said *Margaret
Dorsey*, the mother and natural guardian of the said infant
heir, having been appointed a guardian for him by the
chancellor, to defend and answer the said bill, and to do
all things appertaining thereto; and the said *Margaret Dor-
sey* having appeared to the said petition, and accepted the
appointment of guardian to the said infant heir, and not
showing any cause why the petition aforesaid should not
be granted; and having signified to the chancellor that she
does not know of any objection to granting the complain-
ant the relief prayed for; and all parties concerned having
been fully heard—It is ordered, adjudged and decreed,
this 10th day of February 1779, on and with the assent of
the said *Margaret Dorsey*, as guardian of the said *Edward
H. Dorsey*, that the said *Margaret Dorsey*, as guardian of
the said *Edward H. Dorsey*, do convey and assure to the
said *John Wells*, his heirs and assigns, in fee, all that par-
cel of land, being part of a tract or parcel of land called
*Chew's Vineyard*, lying and being in *Anne-Arundel* coun-
ty, beginning," &c. "containing 364 acres, upon his the
said *John Wells* paying to the said *Margaret Dorsey*, as
administratrix of the said *Samuel Dorsey*, the principal sum
of £132 8 2, current money, and also interest from, &c.
saving and reserving liberty, according to the act of assem-
bly in such case made and provided, to the said *Edward
H. Dorsey*, to show cause, within six months after he shall
have attained the full age of 21 years, and also for the

heirs of the said *Edward H. Dorsey*, if he shall not so long live, in six months after his decease; if the said heirs shall then be of full age, and if the said heirs shall not then be of full age, in six months after such heirs shall have attained his, her, or their full age, why such conveyance as above decreed ought not to have been ordered or directed." In pursuance of this decree, *Margaret Dorsey*, the guardian of *Edward Hill Dorsey*, made and executed an indenture on the 27th of February 1779. *Edward Hill Dorsey*, at the time this suit was instituted, had attained the age of 24 years, and he had not at any time heretofore made application to the court of chancery to show cause why the said decree should not have been made, or such conveyance, so decreed, should not have been ordered or directed. The parcel of land, for which the present suit is brought, is the same land described in the will of *Caleb Dorsey*, and in the said decree and conveyance. At the time *Caleb Dorsey* executed his last will and testament, *Samuel Dorsey* was married, and had actually disposed of himself in marriage to *Margaret* or *Peggy Sprigg*, mentioned in the same will. In November 1773, the following act of assembly passed the legislature of *Maryland*, ch. 27. "An act for the relief of *Samuel Dorsey*, of *Anne-Arundel* county." The act, after reciting the will of *Caleb Dorsey*, and the restrictive clause upon his son *Samuel's* marrying Miss *Sprigg*, states—"And whereas the said *Samuel Dorsey*, by his humble petition to this general assembly, hath prayed an act may pass for annulling the said restrictive clause in his father's will, and *Edward Dorsey*, the devisee over, now an infant of the age of *fourteen* years, and upwards, *Charles Ridgely*, and *Rebecca* his wife; *William Buchanan Junior*, and *Peggy* his wife, *Michael Pue*, and *Mary* his wife, and *Eleanor Dorsey*, have joined in the same petition, and *William Goodwin*, and *Milcah* his wife, have not objected against such act; the said *Rebecca Ridgely*, *Peggy Buchanan*, *Mary Pue*, *Eleanor Dorsey*, and *Milcah Goodwin*, being the daughters of the said *Caleb Dorsey*, and devisees over in default of issue of the said *Edward Dorsey*; and it appearing that the marriage of the said *Samuel Dorsey*, with the person described in the said will by the name of *Peggy* or *Margaret Sprigg*, can be no disparagement, Be it therefore enacted," &c. "That the said condition, or restrictive clause, shall be wholly void,

and that the said will shall stand and be construed as if no such clause had been contained therein" *(a)*. At the time of the passage of this act, *Edward Dorsey*, brother of *Samuel*, was a minor, about fourteen years of age. The lease, entry and ouster, as stated in the declaration in ejectment, were admitted. The question submitted to the court was, Whether or not the plaintiff was entitled to recover notwithstanding the decree of the court of chancery and the conveyance executed in pursuance thereof?

*(a)* In the Upper House, on the 20th of December 1773, on the passage of the bill, entitled, "An act for the relief of *Samuel Dorsey*, of *Anne Arundel* county," *Daniel Dulany*, esquire, with the leave of the house, desired that his protest might be entered, which follows, viz. Dissentient.

1st. Because the owner of property having a legal right to give, has a legal right to dispose of it upon what terms, (consistent with the policy of the law,) he thinks proper, and therefore, whatever was the motive of the testator, *Caleb Dorsey*, in devising a considerable part of his estate to his son *Samuel*, upon the condition expressed in his will, a posterior law, professedly annulling the condition, which the testator was indubitably authorised by the prior general law to annex to the devise, will, by a restrospective operation, rescind an act incident to the right of ownership.

2dly. Because by the liberal devise to *Samuel Dorsey*, it appears, that the testator was very far from being destitute of the feeling of parental affection, and if he had not even made any provision for his son *Samuel* in his will, which I conceive would have been a case of greater compassion, than that which the petition represented, it would be a most extraordinary and unprecedented proceeding to enact a particular law for the very purpose of controling the will of the owner of property, which under a prior general legal establishment he had an incontestable authority to dispose of, as he thought proper.

3dly. Because the motive of the testator, in annexing the condition in order to prevent his son's marrying the woman described in his will, is not known, and if known, (supposing the effect of a will ought to depend upon the propriety of the testator's motive,) might appear to have been proper. In this state of uncertainty, the possibility of a proper, just motive, (and such may be imagined,) affords, I conceive, a sufficient reason for not controling the operation of the general established law, by which the owner of property is authorised to dispose of it by his last will, not being inconsistent with the policy of the law, in such manner as he thinks fit.

4thly. Because, as the motive for annexing the condition to the devise to *Samuel Dorsey* is not known, the principle of this act may be, I conceive, inferred to have been, that the will of a parent ought to be controled by a particular subsequent legislative act, if the majority of the legislators, in their respective branches, suspect the motive of the testator to have been such, as they imagine would not have influenced their conduct in a similar situation, and that too supposed upon conjecture only; a principle which, I conceive, if maintained with consistency by future legislators, may be productive of great inconvenience.

5thly. Because the reasoning from the circumstance that the devisees in the will of *Caleb Dorsey* have joined in the petition for the act of assembly, is, I conceive, of little weight, inasmuch, as upon a breach of the condition annexed to the devise to *Samuel*

The cause was argued in the General Court at May term 1798, before Goldsborough, Ch. J. and Chase, and Duvall, J.

*Ridgely* and *Shaaff*, for the Plaintiff.   A court of chancery possesses no power, independent of legislative provision, to compel a *tenant in tail* to a specific performance of a contract made by the ancestor, for *entailed* land; and under the acts of November 1773, *ch.* 7. and October 1778, *ch.* 22, the court of chancery in this state has no such power.   They referred to 1 *Fonbl.* 291.   *Ross vs. Ross,* 1 *Chan. Cas.* 171.   *Norcliff vs. Worsley, Ibid* 236.   *Fox vs. Crane & Wight,* 2 *Vern.* 306.   *Weale vs. Lower,* 1 *Eq. Ca. Ab.* 266.   2 *Com. Dig.* 122, 127.   *Sayle vs. Freeland,* 2 *Vent.* 350.   *Davy's* Case, 1 *Ld. Raym.* 531.   *Coventry vs. Coventry,* 1 *Stra.* 602.   *Firebrass's* Case, 2 *Salk.* 550.   *Powell vs. Powell, Finch,* 278.   A tenant in tail, before the act of June 1773, *ch.* 1, authorising him to convey by deed of bargain and sale, could not alien at common law, except by common recovery and by fine.   1 *Fonbl.* 289, 290, 291.   This was the law until the act of June 1773, *ch.* 1, which was similar to the act of November 1782, *ch.* 23. But no power is given by this act by which a decree in the case of a tenant in tail is made as good and available as in case of a tenant in fee.   The decree in this case was obtained by suppressing the truth, and suggesting what was not true; and it cannot be contended that such a decree shall be an estoppel to all inquiry in this court, where the sole power of deciding the case is constitutionally vested. The decree is set up and offered in evidence as an effectual bar to the plaintiff's recovery; and it will be said, no doubt, that if the plaintiff prevails, this court will reverse a decree of the court of chancery, and exercise the powers of

---

*Dorsey,* the immediate limitation is to *Edward Dorsey,* who is an infant, of the real estate in tail, and of the personal estate absolutely; for the further limitation of the personal estate upon the death of *Edward Dorsey,* the infant, without heirs of his body, is I conceive, void; and the other devisees, in respect of the limitation over to them of the real estate, upon the death of *Edward Dorsey* without issue, may transfer their interest to *Samuel,* without the aid of the legislature; and *Edward Dorsey,* when of age, would also have it in his power to relinquish the benefit of the condition in favour of *Samuel.* But the act of assembly, barring the limitation to *Edward,* deprives the infant of the provision which the general law hath established for the protection of infancy.

D. Dulany.

an appellate court. It is not contemplated to call in question the decrees of the court of chancery, where its jurisdiction was competent, and rightfully exercised; but where a decree of that court is offered *in evidence* in this court, on a question where that court has notoriously no jurisdiction, and where the chancellor was evidently imposed on, or deceived by a misrepresentation of facts, surely this court will not say that such decree shall be conclusive on them. In all cases which the laws of our country have intrusted to the decision of the court of chancery, its decrees are *conclusive evidence*, as if, for instance, the lessor of the plaintiff had only an *estate in fee*, because the chancellor would then have exercised proper jurisdiction; will the court, by deciding that a tenant in tail is not barred of his remedy at law by a decree in chancery, where the chancellor hath no jurisdiction, and which decree was only intended to affect and bind him as a tenant in fee, reverse such decree? Or act as a court of appeals? No one who has seriously reflected on the case, and who is acquainted with the chancery jurisdiction, and their powers, can seriously advocate the affirmative of these questions. The powers of this court are the same as those of the King's Bench in *Great Britain*. It has a superintending power over all other inferior jurisdictions, either civil, ecclesiastical or military. The court of King's Bench has superintendency over all inferior jurisdictions, and are by law intrusted with the exposition of such laws and acts of parliament as prescribe the extent and boundaries of their jurisdiction. 4 *Bac. Ab.* 250. The King's Bench may prohibit any court whatsoever, if they exceed and transgress their jurisdiction. No court in *Westminster Hall* but may be prohibited by the court of King's Bench, if they exceed their jurisdiction. 18 *Vin. Ab.* 50. To prove that the chancery is one of those courts over which the court of King's Bench has jurisdiction, they cited *Davy's* Case, 1 *Ld. Raym.* 531. 4 *Bac. Ab.* 252. To show how far decrees in chancery are evidence in courts of law, they referred to *Esp. Dig.* 758, 760, 761, 762. *Robins vs. Crutchley*, 2 *Wils.* 122, 127. *Bull. N. P.* 243, 244. *Burton vs. Fitzgerald*, 2 *Stra.* 1078. That the decree did not operate as an estoppel, they cited 3 *Com. Dig.* 269, 271, 272, 273. *Co. Litt.* 352, a. *Hayne vs. Maltby*, 3 *T. R.* 440. *Fairtitle vs. Gilbert*, 2 *T. R.* 171. *Esp. Dig.* 752, 753. 10 *Vin.*

*Ab.* 421, 422, 480.   *James vs. Landon, Cro. Eliz.* 36,
4 *Inst.* 84.   1 *Bac. Ab.* 559.   If the truth can be disclosed,
it appears that the court of chancery has given a decree
for which that court had no authority—a decree for a con-
veyance by a guardian of a minor in tail.   Before the act
of October 1778, *ch.* 22, the chancellor had no power to
decree a conveyance by guardian; and if such conveyance
was made, it was inoperative.   Before the act of 1785, *ch.*
72, a decree of the court of chancery only acted on the
person, and not on the right, of course without the deed it
did not divest the title.   *Com. Dig.* 45, 106.   1 *Fonbl.* 29.
The power to decree a deed from an infant, is only under
this law, and the decree here cannot divest the title of the
lessor of the plaintiff, it not being conformable to that law.
The law says, where *the party had power to bind*, the chan-
cellor may decree a deed.   Here the party had no power
to bind.

*Martin*, (Attorney General,) for the defendant.   The
case stated for the opinion of the court, has submitted two
questions for their consideration—1. Whether as the court
of chancery had decreed a specific execution of the con-
tract made between *S. Dorsey* and *J. Wells*, against *E. H.*
*Dorsey*, the infant heir, allowing him a certain time after
he arrived of age, to show cause why the decree should
not be valid, and he not having within that time availed
himself of that provision, he can in an ejectment set aside
the proceedings; or in other words, whether the general
court can reverse a decree of the court of chancery, and
declare null a title established by its decree, while it re-
mains in full force unreversed?

2.   Whether the legislature were competent to take
away the actual vested rights and property of one private
individual, and give them to another private individual,
who antecedently had no legal or equitable title to or in-
terest therein?

1.   It is the peculiar province of the court of chancery
to determine in what cases there should be specific execu-
tions of contracts; and although it should determine ever
so often, that a contract made by him who holds land in
tail should be specifically executed against the heir in tail,
unless such decree has been set aside in the court of chan-
cery, by a review, or reversed by the court of appeals, on

1815.

Partridge
vs
Dorsey

an appeal, it remains binding on the parties, and must be respected by every court of law. In this case, *E. H. Dorsey* neglected to avail himself of the provision in the decree, that is, within six months to show cause why the decree ought not to have been made, or ought to be set aside. He is now absolutely concluded thereby; or at all events, a court of law cannot set aside this decree of the court of chancery. In *Moses vs. Macferlan*, 2 *Burr.* 1009, Lord *Mansfield* declared, that "till a judgment is set aside, or reversed, it is conclusive, as to the subject matter of it, to all intents and purposes." There the ground upon which the action proceeded would have been no defence in the court of conscience; but the allegation in this case, that the lands were entailed, would have been a defence in the court of chancery, provided that court could not specifically enforce those contracts, and the decree gave *E. H. Dorsey* six months after he arrived to full age to show that or any other fact which would set aside the decree. He referred to *Evan's Essays*, 63 *to* 70. *Peake's Evidence*, 50 *to* 52, (and notes.) *Meadows vs. Dutchess of Kingston*, *Ambler*, 762. *Clews vs. Bathurst*, 2 *Stra.* 960. All which establishes incontestably, that the decree of the court of chancery cannot be questioned or set aside in this incidental manner. It is not to be inquired whether the chancellor was in possession of all the facts, or upon what grounds he decreed. A decree of his court, until reversed, is as binding as the judgment of any other court. Its jurisdiction is as unlimited as that of the general court; and in this case he was acting upon a subject completely within his jurisdiction. Since *Coke's* time no prohibitions have issued out of the court of King's Bench to chancery. In the case from *Raymond* no prohibition issued, and it does not appear that the prohibition would have issued. In *England* infants are bound, unless they show cause within a certain time after they come of age. It is only necessary to consider what the law was as established by the act of November 1773, *ch.* 7. While the decree and conveyance remained unrevoked, the title must be out of *Dorsey*. This court has no right to determine whether the court of chancery had jurisdiction. It is a subject of equity, not of common law jurisdiction. The act of assembly does not confine the chancellor to fee simple estates. When the subject is brought before the chancellor, who is to de-

cide whether the estate was held in fee or tail, he may send it to the courts of common law, but he is not obliged. It appeared that the chancellor only had the power to determine whether a conveyance ought to be made. If the chancellor decided erroneously, a tribunal other than this must reverse his decree.

2. The act of assembly is an absolute nullity. A legislative body has no more right to do a judicial act, than a court of justice has to do a legislative act; each are equally improper, each equally void. No legislature has a right to interfere with, change, alter or take away, private property, except where the public interest demands it, nor then without making a compensation to the person from whom it is taken. 1 *Blk. Com.* 139. It would appear by the statement, that *C. Dorsey* annexed to his devise a proviso, which proviso the legislature, in the plenitude of their power, have annulled; and have declared, that though the testator's intent was to devise over the estate on a contingency, that such intention should not prevail; that the limitations over should be void. Such an act passed by a legislature body is not operative, it is an act of power, not of right. A law, not intended to influence the community in general, but to rob the next devisee, (who was an infant at the time the law passed, and incapable of giving his consent to it,) of so much property, must be a nullity.

*Shaaff*, in reply, cited 2 *Com. Dig.* 122, to show, that if tenant in tail contracts for sale, receives the purchase money, and dies without fine or recovery, the agreement shall not be carried into execution against the issue in tail, or remainder-man claiming *per formam doni*, even though tenant in tail had been decreed to perform. It will not be denied, that unless issue in tail had land in fee from his ancestor, he is not bound by the contract of that ancestor. With respect to the act of assembly, it is expressly declared therein that the devisees over had assented.

*Curia adv. vult.*

Before the next term, *Goldsborough* Ch. J. died, and no decision was given. The case was depending in the general court when that court was abolished, and was therefore transferred to the county court of *Anne-Arundel*, by the act of 1805 *ch.* 65.

1813.

Partridge
vs
Dorsey

At April term 1807, the cause was argued in that county court, before CHASE, Ch. J. and HARWOOD, A. J. by *Ridgely*, and *Johnson*, (Attorney General,) for the plaintiff below, and *Martin*, for the defendant. The arguments of the first and last gentlemen were similar to those used before the late general court.

*Johnson*, (Attorney General,) for the Plaintiff. The only question in this case is, Shall an heir in tail be barred by a deed executed by his guardian, grounded on a decree of the court of chancery, which decree is founded on an untrue allegation stated in the bill, and admitted by the guardian's answer, that the ancestor was seized in fee? If an heir so circumstanced can be barred, the plaintiff must fail; if the reverse, he must succeed. The authorities produced most conclusively prove, that if it had appeared in the bill in chancery that the defendant, (the now lessor of the plaintiff,) was seized in tail, and not in fee, the decree could never have been obtained, and the conveyance would never have been executed. Nothing is more clear, than that the issue in tail is not bound to carry into execution the contract of the ancestor. The estate tail, before the act of assembly, (*June* 1773, *ch.* 1, and *November* 1782, *ch.* 23,) could only be barred by fine and recovery; since the act of assembly it may be barred by deed. The defendant, if he claims under *John Wells*, and if he succeeds, avails himself of a decree which ought never to have been obtained, and which never could have existed if the *truth* had been disclosed. He protects himself under the *suggestio falsi* of the bill, and the *suppressio veri* of the answer. He protects himself by a compound fraud, practised against the lessor of the plaintiff, at a time when he was but seven years of age. It is contended, on two grounds, that the plaintiff is not precluded from recovery.

1. That the decree *exceeded the jurisdiction* of the court, and what was done there was *coram non judice*, and void.

2. That the decree was obtained by *fraud*, and therefore that, and the deed grounded upon it, are *void*.

1. The court of chancery possesses two kinds of jurisdiction—The one ordinary, agreeably to the common law, *secundum legem, et consue tudinem angliæ.* The other extraordinary, according to the rule of equity, *secundum equum et bonum.* 4 *Inst.* 79. The ordinary power of

the court appears coeval with the law; the extraordinary, in comparison, of recent date; no traces of the exercise of the latter jurisdiction is to be found before the reign of *Henry VI*, (which commenced in 1432;) since that period, to the present date, owing to the narrow contracted rules of the courts of common law, and various other causes, unnecessary to be detailed, its powers have been immensely increased by the decision of those who presided therein, and by various acts of the legislature in *England*, and this country. Near *two hundred* years after the extraordinary power of the court was recognized, its authority to control a judgment obtained at law, although evidently grounded on fraud, was contested. The opposition to the power of the court failed, and the authority has since been invariably exercised. The court of equity, (for I shall distinguish the extraordinary power of the court by that name,) is no court of record. It can bind but the person only, and neither the estate of the defendant in his lands, or his personal property. 4 *Inst.* 84. The late general court possessed the same controling influence over inferior establishments and jurisdictions that the court of King's Bench exercised in *England*, "which keeps all inferior jurisdictions within the bounds of their authority, and may either remove their proceedings to be determined here, or prohibit their progress below." 3 *Blk. Com.* 42. All the authority possessed by the general court is transferred to the court before whom this cause depends. If then the court of equity possessed no jurisdiction over the thing, but could only act against the person to compel him to do what the decree commanded, how can a deed, executed by the guardian of a minor, pass the legal estate of the minor, unless that estate was such as could be decreed to be conveyed consistent with the acts of assembly *enlarging* the jurisdiction of the court? All the jurisdiction possessed by the court to decree a specific performance against infants, to be carried into effect by the deed of the guardian, is founded on the acts of November session 1773, *ch.* 7, and October 1778, *ch.* 22. Before those acts, and at present in *England*, the decrees against infants are, that they shall convey when of age, unless within a given time cause is shown to the contrary. There the conveyance must be *by a person having the legal estate.* The act of 1773, *ch.* 7, is most evidently confined to fee simple estates; the

language is, that persons under age, "seized or possessed of lands," &c. "or bound by an agreement to convey, made by some person or persons, having right or title to make such agreement, and therefore subject or liable to a decree for a conveyance, or a suit for a specific performance." If the position be correct that the heir in tail is not bound, by the agreement of the ancestor, to convey, and that the will of *Caleb Dorsey*, in the case stated, gives only an entail, then it clearly follows that the act of assembly has no effect on the case. This act changes the proceeding from what it is in *England*, and was before in this state. The decree is for the conveyance to be made during the minority. The time is given to vacate the deed, or rather to show cause why it ought not to have been made. Under the act of 1773, *ch*. 7, a practice must have prevailed of obtaining the deed from the guardian and not the minor. Those conveyances, although grounded on the decree, which had the supposed power vested by the act for its foundation, were supposed defective, to remedy which the act of 1778, *ch*. 22, passed. Under this law the deed is to be made by the guardian, and the former deeds are confirmed. Under this law, "the deed of the guardian of such person," &c. "shall be valid; that is, of such to whom lands had so descended are to be bound by the contract to convey; in other words, the heir in fee simple. If the act makes valid the deed of the guardian of such person, it leaves the deed of the guardian of other persons unaffected. As to them it is the same as if the law had never passed. But the act of 1778 proves another thing; that the conveyances made under decrees do not pass the legal estate, unless the decrees, and the conveyances in pursuance thereof, correspond with the law, under which they are made; where they depart from them even in form, nothing passes. From what has been said there could be no question, if the facts existing in the cause had been disclosed; that is, if the tenancy in tail had appeared, the decree could not have been made; but as the facts did not appear, and as the decree has taken place, can its effects be controled by this court? It is for the interest of society there should be an end of law suits; and therefore, where a judgment or decree is made by a court of competent jurisdiction, there the merits of that judgment or de-

cree can never be inquired into by an original suit. If there is an appeal allowed from such decision, you must resort to it; if there is not, you are concluded by the decision in the first instance. The reverse of the principle is equally clear, that a judgment or decree of a court, not having competent jurisdiction, concludes nothing; it is of itself a nullity. Suppose, for instance, before the act of descents took effect, a man died seized in fee, leaving three children, A, B and C. The eldest, A, left the estate, and was supposed dead, intestate, leaving B his heir, who sold to D, gave a bond of conveyance, received the money, and died. A bill is filed for the conveyance, alleging B was seized in fee. The answer admits it, and the decree passes. Afterwards a will is discovered, by which the land, previous to the decree, was devised in fee to C, against whom the decree was had. Surely the decree, grounded on the supposed interest of B, and the corresponding obligation to convey, could not operate, when it turned out that B had no estate, and C claimed independent of him. The same applies to the tenant in tail, he claims *not through*, but *per formam doni*. The decree in this case doth not specify the effect of the conveyance, but in general decrees, and declares thereupon *the grantee shall have all the estate*, which was in *Samuel Dorsey*, (for instance,) and *which from him descended to, or devolved on, the defendant*. The act of assembly, it is true, declares the deed to have the same effect, as if executed by a person of full age; but yet it relates to deeds executed by minors in fee, who must have inherited from the ancestor. The jurisdiction of courts are circumscribed, 1. With respect to *place*. 2. With respect to *persons*. 3. With respect to the *subject matter of the jurisdiction*. We have clearly seen that the subject matter of the court of equity decreeing conveyances, is composed of fee simple estates; that they have no power or control over estates tail before or since the acts of assembly. But it may be contended, that as the court possesses the power to decree a conveyance, and having done so, it cannot be defeated by any thing now appearing, that the case was such as, if known, would have excluded the jurisdiction. The case of the *Marshalsea*, 10 *Coke*, 69, 76, proves that the officer who executes a precept, issuing on a judgment of a court of com-

1813.
Partridge
vs
Dorsey

petent jurisdiction, is liable as a trespasser. There a suit had been brought against one *Thomas Owingsted*, stating on the face of the declaration that he was within the jurisdiction of the court; he appeared—did not plead to the jurisdiction—a judgment is obtained against him; after an execution returned *non est*, process issued against his bail, who was taken, and for which the suit was brought; the *Marshalsea* to the action pleaded the judgment, &c. as a justification; the plaintiff replied, that neither himself, nor *Owingsted*, were within the jurisdiction of the court; the defendant demurred. In this case these principles are established—when a court has jurisdiction of the *cause*, and proceeds *inverso ordine*, or erroneously, there no action will lie against the party who sues, or the officer who executes the process; but where the court has *no jurisdiction*, the whole is *coram non judice*, and actions will lie. The same principles are recognized in *Perkins vs. Proctor*, 2 *Wilson*, 382, where the defendant, the assignee of a bankrupt, who as such had obtained a judgment in ejectment, is made a trespasser, because the person declared to be a bankrupt was afterwards declared not to be liable to the bankrupt laws. It is said, in giving the opinion of the court, that "jurisdiction concerning bankrupts is confined to particular *persons* and *cases*, and the court of chancery acts herein, solely upon the application of the party petitioning, at whose peril the commission issues, and if he sues it out upon *false suggestion*, the law gives a remedy against him whose person or property is thereby invaded." This case, as well as the former, distinguishes between irregular judgments, judgments reversed, and those given without jurisdiction—the first and last are void. In these cases nothing appeared in the original proceedings excluding the jurisdiction of the courts; the disclosure is made in the one by the pleadings, and in the other by the evidence in subsequent suits. The case at bar cannot be distinguished from them. It is true the defect of jurisdiction arose as to persons, but the same principles exist, and are recognized, where the *subject matter* is not within the jurisdiction of the court. If the court has no jurisdiction over the case, or the subject matter, its proceedings are void; the judgment stands for nothing. But how strong is the reason why they should be void, when he who claims the aid of them by a *false suggestion*, induced the belief

of jurisdiction. "The law gives," in the language of the court in *Wilson*, "a remedy to him whose property is invaded." In *Moses vs. Macferlan*, 2 *Burr.* 1009, although the court got round an original judgment, yet before the decision in a subsequent case can be controled by a former judgment, it must appear to be the judgment of a court of competent *jurisdiction*. There the court would not be bound by the judgment of a court even of competent jurisdiction, because the *same question* did not arise. Here the question which was in the court of equity, and the one under consideration, are totally variant; there is no similitude between them. There has been a cause in the supreme court of the *United States*, which clearly establishes the authority of the court—that it is not controled by the decree—It is the case of *Clarke vs. Young*, 1 *Cranch*, 189, by which it appears that *Clarke* had bought from *Young*, & Co. a quantity of salt, and assigned to them a promissory note as a conditional payment. The drawer of the note proved insolvent, and a suit was brought against the endorser, *Clarke*. The plaintiffs failed. They then brought a suit for the salt, and the former judgment on the note was pleaded as a bar, that being the same cause. The plaintiffs obtained a judgment, which was affirmed in the supreme court. The chief justice, in giving the opinion of the supreme court, remarks—"it is perfectly clear, that in this *case* the *same question* was not tried in *both causes.*" If this is to be the criterion, then I may declare, that this court is not concluded by the other, because it most evidently appears that the same question never was before both courts. But in the case before the supreme court, the shades of difference must have been slight indeed; for in the first case the plaintiffs ought to have succeeded, unless by delay or negligence in proceeding against the drawer, they made the debt their own; and if they did so, then the assignment of the note, with such conduct, amounted to a payment. But here nothing is more evident than that the questions are totally different. The decision of the supreme court of the *United States* defeated the effect of a judgment rendered by a court of competent jurisdiction. It confirmed the judgment of a court of coordinate jurisdiction with that which tried the first cause. The one, in effect, determined the assignment to be a payment, the other, that it was not; and that during the continuance of the first

1813.
Partridge
vs
Dorsey

judgment. The supreme court considered the *sameness* of the question the criterion whether a bar or not. Here we deny the jurisdiction, and here the questions are not the same.

2. The decree was obtained by fraud, and therefore the decree, and the *deed* grounded thereon, are void. The chancery, *cancellaria*, so termed *a cancelliando*, from cancelling the King's letters patent, when granted contrary to law, which is the highest point of its jurisdiction. 4 *Inst.* 89. 3 *Blk. Com.* 47. The general court possessed the same power when the patents were obtained by *fraud.* If then, to make *patents* void is the *highest exercise* of authority, and this court *possesses* that *power*, it surely has the right of determining a deed to be void, which deed for its validity rests on a decree obtained by fraud. Fraud will invalidate in a court of law as well as in a court of equity. *Bright vs. Eynon*, 1 *Burr.* 390. *Fermor's* case, 3 *Coke.* 77. 2 *Morg. Ess.* 60. No case exists, or can exist, in which a court of law has ordered a patent to be cancelled. This power the court of equity alone possesses. But the court of law can do, and has done, what in effect is the same, adjudged, if it was obtained by fraud, nothing passes. In *Boreing vs. Singery*, 4 *Harr. & M‘Hen.* 404, the general court determined, that if the jury were of opinion that the patent obtained by the defendant was fraudulently procured, that then nothing passed by it, and the junior grant to the plaintiff entitled him to the land—most explicitly, by this decision, recognizing the right of adjudging patents void, and freeing the parties from the necessity of resorting to the court of chancery. In *Bull vs. Sheredine*, 1 *Harr. & Johns.* 410, the general court also determined, if the deed executed by the sheriff of Harford county, under a *fieri facias*, was made through fraud, that it passed nothing. Surely then, if in the most transcendent cases the court has the power to adjudge the instruments void, they are not precluded in inferior instances, and more especially where the proceedings, so to be adjudged void, are not matters of record. It can scarcely be necessary to proceed to an argument, that the decree in question was obtained by fraud. A mere representation of the facts stamps the whole proceedings with the most conclusive marks of fraud. The chancellor is induced to believe *Samuel Dorsey* had an estate in fee. The complainant makes

that allegation; the guardian admits it. The complainant obtains a deed for land, it was impossible for him to procure but by a false suggestion—The guardian receives a sum of money, which could not have been received but by an untrue admission.—Both the badges of fraud, *suggestio falsi*, and *suppressio veri*, are used. In the examination of the subject the court will perceive the case is argued as if the defendant claimed under *John Wells*, and therefore must stand and is liable to the same judgment he would have received. But his claim does not appear in the case stated. He, from any thing in the cause, is a mere stranger. He cannot avail himself of the decree, and claim the benefit of that, and the deed by *Estoppel*. He is not a party or privy. Since the year 1766, lands must be conveyed in a certain peculiar manner; unless that is pursued nothing can pass The acts of assembly since enacted, have in certain special cases authorised other persons than the legal holders to execute deeds for land, in which such persons had no interest. But it follows, as the *prohibition is general*, and the *permission special*, the land to be conveyed must be *specially* circumstanced as the *law* prescribes. We have seen that this land was not so circumstanced, and therefore we contend nothing passed.

CHASE, Ch. J. delivered the following opinion of the court. In considering this case, and the objection to the recovery of the plaintiff, the court have, as first in order of time, resorted to the will of *Caleb Dorsey*, under which the plaintiff derives his title to the land in question, to determine the quality of the estate acquired by *Samuel Dorsey*, the father of the lessor of the plaintiff, in the land, under the will, and are of opinion, that an estate in tail was devised to *Samuel Dorsey*, and that the lessor of the plaintiff, as heir or issue in tail, was not compellable to fulfil or execute the contract for the sale of the land made by his father to *John Wells*.

The court are also of opinion, that the court of chancery had no authority or jurisdiction to decree a specific execution of the contract against the lessor of the plaintiff, as heir or issue in tail of his father *Samuel Dorsey*. The act of assembly for the amendment of the law, which passed in 1773, (November session,) extending only to cases in which the heir was bound to fulfil the contract of his an-

cestor; and the heir in tail claiming the land *per formam do-ni*, and not deriving title under his father, is not bound to convey the land in fulfilment of the contract of his father.

It is objected that the decree of the court of chancery, set forth in this case, and the conveyance made pursuant thereto, will conclude the plaintiff, and prevent his recovery.

The bill in chancery filed by *John Wells* against *Margaret Dorsey and Edward Hill Dorsey*, makes a false suggestion in stating that *Samuel Dorsey* was seized in fee of the land in question; and *Margaret Dorsey*, by admitting in her answer the said statement, suppressed the truth. It is not material whether the suggestion and admission were made for want of due consideration of the will of *Caleb Dorsey*, or for the purpose of giving the chancellor jurisdiction in a case, which was not properly cognizable by the court of chancery. The decree is founded on the bill and answer. The question, whether *Samuel Dorsey* took a fee simple or fee tail under and in virtue of the will of *Caleb Dorsey*, was not decided by the chancellor. The will of *Caleb Dorsey* was not even referred to, or brought into the view of the chancellor, by the proceedings. The question, whether the heir in tail was bound to convey the land in completion of the contract of his father, was never considered or decided by the chancellor. The said questions never having been directly decided by the chancellor, the same not having been the subjects of his consideration, nor could arise on the said case, the court are of opinion, that the plaintiff is not concluded by the decree, nor can the decree, and conveyance made pursuant thereto, operate to divest the right and interest of the lessor of the plaintiff in the land, as heir in tail, under the will of *Caleb Dorsey*.

To prevent the recovery of the plaintiff in this case, it is also objected, that the act for the relief of *Samuel Dorsey* is an absolute nullity.

The above act of assembly makes void the condition or restrictive clause annexed to the devise to *Samuel Dorsey*, contained in the will of *Caleb Dorsey*, and is founded on the petition of *Samuel Dorsey*, and the assent of *Edward Dorsey*, the next devisee over, who was of the age of fourteen years, and on the assent of all the persons then interested under the will of *Caleb Dorsey*, except *William*

*Goodwin*, and *Milcah* his wife, who did not object to the passage of the said act.

It is not stated in the case that *Edward Dorsey*, after he attained the age of twenty-one years, ever withdrew his consent to the said act, or in any manner objected thereto.

It is stated in the act of assembly, that the marriage of *Samuel Dorsey*, with the person described in the will of *Caleb Dorsey*, was no disparagement to *Samuel Dorsey*.

At the time the act of assembly passed, the power and jurisdiction of the general assembly of *Maryland*, over all subjects of legislation within the limits of *Maryland*, were as great and transcendant, as the power and jurisdiction of the parliament of *England*, within the scope of their authority. And *Sir Edward Coke* informs us, "the power and jurisdiction of parliament is so transcendant and absolute, that it cannot be confined, either for *causes* or *persons*, within any bounds." This passage is cited and approved by *Sir William Blackstone*, who adds—"the parliament hath sovereign and uncontrollable authority in making, confirming, enlarging, restraining, abrogating, repealing, reviving and expounding, of laws concerning matters of all possible denominations, ecclesiastical or temporal, civil, military, maritime, or criminal." He also declares, that "all mischiefs and grievances, operations and remedies, that transcend the ordinary course of the laws, are within the reach of this extraordinary tribunal."

The general assembly were satisfied that the facts and circumstances disclosed in the act as the foundation of it, were sufficient to warrant the interposition of their transcendant and extraordinary jurisdiction; and the acquiescence of *Edward Dorsey*, and all persons concerned or interested under the will of *Caleb Dorsey*, since the passage of the act, exempt the motives of the general assembly from censure or reprehension.

The court are of opinion, that the act of assembly is not void, but effectual and operative to annul the condition or restrictive clause subjoined to the devise to *Samuel Dorsey* in the will of *Caleb Dorsey*, and do order that judgment be entered for the plaintiff for possession and costs of suit.

To reverse that judgment the defendant brought the present writ of error.

1813.

Partridge
vs
Dorsey

The cause was argued in this court in December 1810, before POLK, BUCHANAN, NICHOLSON, and EARLE, J. by

*Martin*, *W. Dorsey*, *T. Buchanan*, and *Harper*, for the Plaintiff in error; and by

*Ridgely*, and *Johnson* (Attorney General,) for the Defendant in error.

The arguments of the Counsel were nearly the same as those before stated. It was contended, on the part of the plaintiff in error, by

*T. Buchanan*. 1, That the court of chancery had original and exclusive jurisdiction to compel the specific execution of contracts against persons of full age, and that by positive statutory provisions the same power was given against infants, under certain modifications. He referred to the acts of November 1773, *ch. 7*, s. 11, and October 1778, *ch. 22*.

2. That being a court of competent jurisdiction its decrees were conclusive on the subject matter of them, on all other jurisdictions, and could not be collaterally revised or annulled by them. He cited *Evans's Ess.* 62. *Marriott vs. Hampton*, 7 *T. R.* 265. *Philips vs. Hunter*, 2 *H. Blk. Rep.* 402. *Hitchen vs. Campbell*, 2 *W. Blk. Rep.* 827; and *Peake's Evid.* 46 to 52.

3. That there was nothing in the facts disclosed which could invalidate the decree, and consequent conveyance of the land. That if there was, it must be on the ground of *fraud*. That nothing short of fraud could vitiate the proceedings. But that *fraud* could not be *inferred or presumed* by the court on a case stated, or special verdict, it must be expressly found. He referred to *Chancellor of Oxford's case*, 10 *Coke*, 56. *Riddler vs. Punter*, *Cro. Eliz.* 292; and *Crisp vs. Pratt*, *Cro. Car.* 550.

*Curia adv. vult.*

NICHOLSON, J. at this term delivered the opinion of the court, *affirming* the judgment of the county court, in which EARLE, J. concurred.

BUCHANAN, J. dissented: and it was said by the court that POLK, J. (since dead,) had also dissented.

JUDGMENT AFFIRMED.