## THE STATE OF MARYLAND *vs.* THE CUMBERLAND AND PENNSYLVANIA RAILROAD COMPANY.

*Act of 1872, ch. 274, imposing a Tax upon all Coal mined in the State, and Transported to any place in the State, or elsewhere, for Sale, declared Unconstitutional—Liability of the capital Stock of the Mining Companies of the State to Taxation—Rate of Taxation to be Equal and Uniform.*

The Act of 1872, ch. 274 imposing a tax of two cents per ton upon all coal mined in the State and transported by any of the ways enumerated, to any place in the State, or elsewhere, for sale, in so far as it affects to impose the tax upon coal transported from the mines in the State to places beyond the State, for sale, is unconstitutional and void, being repugnant to that provision of the Constitution of the United States which declares that "Congress shall have power to regulate commerce with foreign nations, and among the several States."

The Act of 1872, ch. 274, is unconstitutional and void, for the further reason that in violation of the 15th Article of the Bill of Rights of the State, it imposes a direct and specific tax on a part of the personal property of the State, without regard to value, uniformity or equality.

The capital stock of the several mining companies of the State is liable to taxation according to a fixed and certain rate; and the stock being the representative of the whole property of the corporation, the payment of the tax on the capital stock exempts from taxation all the property both real and personal of the company. And although the State may elect to tax either the capital stock, or the real and personal property of the company, yet it cannot tax both; and if it elect to tax the real and personal property, and not the stock, such property must be assessed according to the same equal and uniform rate, in proportion to its value, as all other property in the State, whether owned by individuals or corporations.

It is not competent for the Legislature to discriminate as between the different species of property, and to tax some by one rule, and some by another. All must bear the burthen alike.

APPEAL from the Circuit Court for Allegany County.

This was an action of debt instituted by the appellant, in the Circuit Court for Allegany County, to recover from the appellee the sum of $13,488.10, together with the penalty of ten per cent. thereon, for the tax sought to be imposed by the Act of 1872, ch. 274, of two cents per ton upon the coal alleged to have been mined in the State, and received for transportation over the railroad of the appellee to points within the State, and elsewhere, for sale, during the months of April, May and June, 1872.

The pleas were never indebted as alleged; and a special plea avowing that the Act of 1872, ch. 274, was, wholly inoperative, unconstitutional, null and void. The State demurred to the special plea. The Court overruled the demurrer and entered judgment thereon for the defendant. The State appealed.

The cause was argued before BARTOL C. J., STEWART, MILLER, ALVEY and ROBINSON, J., and was afterwards re-argued before BARTOL, C. J., STEWART, BOWIE, GRASON, MILLER, ALVEY and ROBINSON, J.

*John H. Handy* and *Attorney General Syester,* for the appellant.

Two leading objections to the Act of 1872, ch. 274, are urged.

1st. That its provisions are in violation of the 15th Article of the Bill of Rights of this State.

2nd. That it is in violation of that provision of section 8 of Article 1, of the Constitution of the United States, which declares that Congress shall have power to regulate commerce with foreign nations, and among the several States.

1st. *As to the 15th Article of the Bill of Rights,* we are told that because certain measures, adopted to ascertain the value of all other property liable to taxation, have

not been resorted to for the ascertainment of the value of the property taxed in this case, therefore, this tax is laid without regard to, and in violation of, the Bill of Rights on this subject. It is to be noted in the first place, that this tax is in lieu of all other taxation on the entire property and franchises of these companies, and that the appellee has taken no steps to demonstrate, that the property and franchises of the mining companies are valued too high, or that a rate of taxation higher than that applied to other property, has been imposed upon the valuation. The entire objection lies in the fact that there was no assessment, and hence the tax is not uniform, being greater than that laid on other property.

There is nothing in the record, from which this Court can say, that the mining companies are paying more than their just proportion, in support of the Government according to their "actual worth in real and personal property."

All this is *assumed;* and it is assumed for no other reason, than because the Legislature has not adopted the same mode of ascertaining the value of the property of these companies, that is adopted in reference to other property, and laid the tax according to that valuation. But the answer to all this, is that there is nothing in the Constitution of this State, requiring the Legislature to adopt any *one uniform mode* of *valuation;* on the contrary, it may adopt *different* modes of valuation for *different classes* of property, and may dispense with all agencies, or tribunals for that purpose; and value the property, and impose the tax directly by legislative Act. "The duty of ascertaining *taxable values,* and of *assessing* * * the *taxes* thereon, necessarily rests in the discretion of the Legislature, and it may perform that duty by its *own* legislative Acts." * * *   *The State vs. Sterling,* 20 *Md.,* 517.

Indeed, to have construed the 15th Article of the Bill of Rights to mean what is contended for by the appellee

in this case, would demolish almost the entire system of taxation in this State.

But it is insisted further by the appellee, *that a rate of taxation,* has been adopted in respect to this class of property, different from that imposed on other classes of property ; and numerous cases are relied on from other States to establish the proposition, that where different *rates* of taxation, are applied to different *classes* of property, the assessment is obnoxious to the constitutional provision, requiring the *rate to be uniform,* and that the true interpretation of the 15th Article of the Bill of Rights, requires not only uniformity in the mode of ascertaing taxable values, *but also uniformity of tax rates* as to every class of property.

Now it must be remembered, that the power of taxation is inherent and absolute, acknowledging no other limits than those prescribed in the Constitution ; that a State may adopt any mode of rating, and any rate of taxation it sees fit, and in the exercise of this acknowledged power may even destroy.

There is nothing in the 15th Article that requires either the *mode* of assessment, or the *rate* of taxation to be alike or uniform, as to every *species* and *class* of *property.* The case of *Tyson vs. State,* 28 *Md.,* 577, when properly considered is decisive of both propositions.

In 28 *Md.,* the subject of the tax on collateral inheritances was considered in its relations, to the very section of the Bill of Rights now before us. The 124th section of Article 81 of the Code, imposes a tax of two and one-half per centum on every hundred dollars of the clear value of the estates, money or securities therein mentioned.

The section singles out a *particular class of property,* and subjects that property to a *rate* of *taxation, different from all other property in the State.* "All estates, real, personal, and mixed, and all securities, money," &c., mentioned in that section are subjected to this tax, notwith-

standing the same property is taxed under the assessment and according to the rates levied under the general law.

It results in a *double tax* on the property. It is a burden on that particular class of property not borne by any other property. And yet it is upheld as being within the power of the Legislature, and distinctly declared *not* to be obnoxious to the 15th Article of the Bill of Rights. It is answered to all this, that it "*is a tax on the privilege of taking.*" But the party *taking,* pays nothing. *The property is taxed;* it goes to the donee shorn of so much of its value; it is a tax on the property itself, "all estates * * * *shall be subject to a tax*" * *. The donee is not considered at all, it is *his property,* not himself, nor his privilege that is taxed.

But there is nothing in the 15th Article, requiring taxes to be laid on *all classes* of property according *to the same rates.* The doctrine of uniformity of taxation has never been so understood or applied, except under Constitutions expressly requiring that the same *method* of *rating property shall be* applied to all classes of property alike. There is nothing like this in the 15th Article, nor any where else in our Constitution. The most that can be said in behalf of this argument is, that the proper interpretation of that Article requires the rate of taxation to be uniform. It is nothing other than the result of a construction of the Article.

But to say that the proper interpretation of the Article is, that taxes shall be laid at a uniform rate on all classes of property, will not help the appellee. Something more must be found either expressed, or arising by necessary implication. For the declaration that taxes shall be uniform, has nowhere been held to mean that the same rate of taxation, shall and must be levied on every class of property alike. The requirement of uniformity is gratified by laying the *same rates on the same class of property,* throughout the taxing district.

The Constitution of the United States requires "that all duties, imposts and excises *shall be uniform throughout the United States.*" But did it ever occur to any Court, to suppose that this meant that the *same duty*, &c., must be laid on *every class* of property subject to that tax?

The letter and spirit of the clause is gratified, by laying the *same duty* (or tax,) &c., on the *same* class of property, and is not violated by laying heavier burdens on one class, and lighter burdens on another.

The idea of uniformity, as contended for by the appellee, and as enforced in the decisions cited and relied on, never has prevailed in this State; and never can, without impregnating the 15th Article with a meaning that would break up a large and important part of the system of taxation now prevailing. The license system of this State would at once be destroyed. The merchant is paying more in support of Government, than the "actual worth" of his property would yield under a uniform *rate* of *taxation,* as understood and contended for by the appellee. His stock in trade is taxed, according to the usual and general rate. But this very same property is required to yield a specific tax, in addition to that levied under the general assessment. The license he pays burdens the merchant's *property with a double tax.* It is no answer to this, that the license is a tax on the business of the merchant. Because such taxation is expressly declared *to be a tax on the property employed in the business. Nathan vs. State of Lousiana,* 8 *Howard,* 77 ; *Woodruff vs. Parham,* 8 *Wall.,* 140.

But we are answered, that such a tax falls within the police power of the State, and is laid with a "political view" for the " good government and benefit of the community," within the last clause of the 15th Article. But what police regulations are conserved in taxing the merchandise of a people? The sale of a yard of cloth, or purchase of a pound of sugar, cannot affect the health or morals of a

people. These are not habits or practices that tend to evil. The tone of society is not affected in the most distant manner.

*The license system of the State applied to merchandise, bears no touch of the police power of the State.* The colonization tax was an instance of a tax laid with a political view. *Waters vs. State,* 1 Gill, 302. The tax on billiard tables and sales of liquor, &c., are instances of taxes laid with a view to "the good government and benefit of the community," for these last affect the habits, and to some extent, the peace and morals of the community.

We are told that this tax is "arbitrary," and "laid without regard to value." The long established policy of the State, the acquiescence of the people in modes of taxation precisely similar in principle and practical effect, cannot be without their great weight in considering subjects of this character. The license system imposes a double tax on the property of the merchant. The collateral inheritance tax does the same, and conspicuous examples are not wanting in which taxation has been imposed on a *particular class* of property, at rates having no reference whatever to its value, but expressly referred to an entirely *different standard.* The tax on slaves is distinctly in point. There was *no valuation* whatever on that *class of property.* The tax was not laid according to any ascertained value, but according to age. Neither was the *mode* or *rate* of *taxation uniform;* for that class of property in Baltimore City was subject to a rate, and standard of taxation wholly different from the same class of property in the counties. Yet for three-quarters of a century this large, and valuable class of property was thus taxed without challenge or question. The tax was arbitrary in the sense applied by the appellee. Neither was it uniform, because it was not laid according to value like other classes of property, and the *same class of property* was differently taxed in different localities.

The tax in the case at bar, is uniform on the same class of property throughout the State.

It is laid directly by legislative Act, and before this tax is pronounced unconstitutional, it ought to be made to appear that the persons or property taxed are not made to contribute according to their actual worth in real and personal property. What relation the tax here imposed bears to the value of the franchise granted, and the value of the *whole of the property* of these companies does not appear. It cannot be assumed that the Legislature had not the proper data upon which to act; on the contrary, we are bound to assume that it had such evidence, information, and data before it, as guided its judgment in this particular. The burden of showing the contrary is on the appellee. *Waters vs. State,* 1 *Gill,* 302.

It is further contended that the law is void, because it necessarily imposes *a double tax.*

The Act of 1872, ch. 274, of itself, certainly imposes but a single tax, and that is the tax of two cents per ton. If that tax be a double one, it must be so by reason of some other tax elsewhere imposed by the Legislature, and which it is incumbent on the coal companies to pay irrespective of the tax imposed by chap. 274. Now, what other tax is there on stock in corporations? None, except that imposed by the Act of 1872, chap. 419, passed on the same day with the Act of 1872, chap. 274. Those Acts then being *in pari materia* are to be construed together, and being so construed, clearly impose but one tax, at the same time upon the same tax payer. *Billingsley vs. State,* 14 *Md.,* 376; *Dugan vs. Gittings,* 3 *Gill,* 154; *Ranoul vs. Griffie,* 3 *Md.,* 60.

The tax imposed by the provisions of the first Act, is only to be collected from such companies as may be doing the character of business by that Act described; and the 7th section expressly states, that "the meaning and intent of this Act" is, "that said coal mining companies

shall not be taxed at the same time on their production of coal, and also on their capital stock." Now, if the coal companies act in good faith, how can there be any conflict in the execution of the two laws, taken as *parts* of the *whole* legislation on the subject?

Chapter 274, is really but a proviso to chapter 419. Properly read, in view of chapter 274, chapter 419, would be on this wise, "and except coal companies, *bona fide* working their mines," &c. If then the coal company is *bona fide* working its mine, it is not required to make return to the Comptroller of the Treasury, of the amount, &c. of its capital stock, under the provisions of chapter 419. If the Comptroller undertook to proceed against the President, &c. of any such company for failure to do so, under the provisions of the last named Act, the defendant could plead the facts of the case to be, that his company was *bona fide* working its mines, and paying its taxes under chap. 274, and if the plea were true, then it would be a complete defence, and a flat bar to either criminal or civil proceeding upon the part of the State's officer.

But it is said the Comptroller *must* collect the tax on the capital stock of corporations on or before the 1st of July, in each year. Where is the law making any such provision? Those persons bound to pay the taxes are required to settle on that day, but the Comptroller is not bound to pursue them at once for delinquency, either civilly or criminally. In truth, the law presumes that the taxes will not be paid on that day, for by the Act of 1872, ch. 255, passed on the same day, and *in pari materia* with chapters 274 and 419, a discount of five per cent. is allowed on State taxes, of "all persons and incorporate institutions," paid before the 1st of September; four per cent. on all paid before the 1st of October, and three per cent. on all paid before the 1st of November. The Comptroller however, has the power to collect by law the taxes on the capital stock of corporations after the expiration of

the current year. In this particular, he has as to corporations generally a discretion as to the time he may allow before proceeding to collect.

Two things are clear:—First. That if the coal companies act honestly, they cannot be compelled to pay a double tax. Secondly. That the Comptroller is not bound to collect the taxes on the capital stock of any corporations on July 1st, of each year—but may collect them after the expiration of the year, and that if he attempted to collect two taxes, he could be successfully resisted by the companies.

2nd. The tax is not in violation of the provision of the Constitution of the United States, which ordains, that "Congress shall have power to regulate commerce with foreign nations, and among the several States."

Whether it is treated as a tax on the business, or on the property of these companies, does not vary the principle contended for in this branch of the argument. For whilst such tax does in fact affect inter-State commerce in the distance, yet no discrimination is made against the article intended for extra territorial sale, and in favor of that designed for sale within the State. No case can be found wherein *the right of a State to tax business or property within its own territory, has ever been denied where no discrimination is made against the commodity received from, or intended for the markets of another State, and that designed for sale within the State.*

The right of a State to tax business or property within her territory, has never been surrendered to the Federal Government, except so far as to restrain the States against making *discriminations* against *extra territorial commerce.*

Within this limit the legitimate subjects of State taxation are all property, and every description of business, except the property of the United States, and the instrumentalities of the Federal Government, created to carry out its own laws. *Nathan vs. The State of Louisiana*, 8 *How.*, 73.

The proposition that a tax on property intended for commerce, but which lays no burden on that intended for extra territorial markets, greater than is borne by that intended for markets within the State, may be imposed, seems well established. In *Hinson vs. Lott*, 8 *Wall.*; 152, the State of Alabama levied a given tax on dealers in whiskey manufactured abroad, and carried into that State and sold. It was insisted that this was in effect a tax on the article carried into the State and sold, and *because* carried in, and hence a restriction on inter-State commerce. But the State had previously laid the *same rate of taxation* on dealers in whiskey manufactured *within the State,* and the tax was therefore maintained.

So too in *Woodruff vs. Parham*, 8 *Wall.*, 123, the City of Mobile had laid a tax among other things, "*on sales at auction,*" and Woodruff, an auctioneer, received and sold at auction, "products of States, *other than Alabama,* and sold the same in Mobile, in the original and unbroken packages. He was sued 'for the tax, and it was urged, among other objections, to the constitutionality of the tax, that it was a burden on inter-State commerce, and prohibited by the 8th section of Article 1st, of the Constitution of the United States. But in answer to that, the Court say at page 140, "There is no attempt to *discriminate injuriously* against the products of other States, or the rights of their citizens, and the case is not, therefore, an attempt to fetter commerce among the States, or to deprive the citizens of other States of any privilege or immunity possessed by citizens of Alabama. But a law having such operation would, in our opinion, be an infringement of the provisions of the Constitution, which relate to those subjects, and therefore void." If it be sound law that a State may tax the property or business within her borders, making no discrimination against that employed in inter-State trade, the Act in question, is constitutional.

The causes which led to the adoption of the section under consideration, and the understanding of those ac-

quainted with the condition of public affairs that prompted it, all concur in demonstrating that it was never intended to restrict the right of taxation in the State, except so far as to restrain it *against measures* which *discriminated against* the commerce and trade of sister States. *See Letter 22 of the Federalist.*

This is a tax on the property or business, if you chose, of the mining companies, without any discrimination against commodities intended for extra territorial markets. It is none the less a tax on the mining companies, because the transportation companies are made the agents to collect it. It is a tax imposed on the property or business of *those required to pay it,* and the selection of the transportation companies, *as agents to collect* the tax, still leaves it a tax to be paid by the mining companies. *The State vs. Mayhew,* 2 *Gill,* 487.

It is insisted however by the appellee that the provisions of the Act of 1872, are identical with those of the Pennsylvania Act, declared to be unconstitutional in the case of the *State Freight Tax,* 15 *Wall.,* 232.

By no rules of construction can the Maryland Act, be understood to be anything other than a tax on the property, or business of the "mining companies of the State," and they, and they alone, *pay the tax,* and the transportation companies are the mere agents selected by the State to collect the tax. Not only does the title of the Act so declare, but its substantial provisions import this, and nothing else. The Supreme Court in 15*th Wallace* did not so interpret the Pennsylvania Act. A majority of that Court held that the Pennsylvania Act imposed the tax, "not on the company" appointed to gather the tax, neither on the mining companies whose produce was carried, "*but upon* the *freight* carried, *and because carried.*" That the burden rested "upon the *freight transported,* or upon the consignor or consignee of the freight imposed, *because the freight is transported.*"

And at page 275, they say that a tax upon *freight transported* from State to State, is a regulation of inter-State transportation, and, *therefore,* "a regulation of commerce among the States."

The payment of the tax was understood to be a condition, upon which this branch of business was made *to* depend. 15 *Wall.,* 276. And the "branch of business" spoken of, is understood to be, and described, as "freight transported from State to State." It was not understood or construed to be a tax either upon the *property* or the business of the tranportation companies; such a tax was held valid in the *Gross Receipts Cases,* 15 *Wall.,* 284, although it affected the articles of commerce to the same extent as the tax in the *Freight Cases.* Neither was it interpreted to be a tax on the business or *property as such,* of the mining companies, or others, whose property was transported. But it was held to be a tax on freight transported from State to State, and *because transported. Gross Receipts Cases,* 15 *Wall.,* 292. It is true that the consignors or consignees of the freight were the parties charged, but they were charged not because their property was within the State, but because that "property was transported." The contribution came from the owner or shipper, *because* he was sending his property *into* or *out* of the State of Pennsylvania. This is regarded as "a regulation of commerce." These views are very plainly stated in the *State Freight Cases;* and accentuated and emphasized, in the *Gross Receipts Cases,* in 15 *Wall.,* where the Court distinguishes the one from the other, whilst in each case, the *practical results* of the *tax are* alike.

It is plain, that if the majority of the Court in the *State Freight Cases,* had agreed with the dissenting Judges, and had interpreted the Act to impose a tax on the *property or business* of the companies and parties *within the State,* which were *required to pay it,* the validity of that law would have been upheld; and it is submitted, that

such is the only interpretation that can be placed on the Act of 1872.

The 2nd section forbids any transportation company from receiving for carriage, any coal mined in this State until the tax imposed "shall have been *paid by the company, association,* or *individual mining the same.*" It is a tax imposed on property in the State, to be *paid by the persons owning the property,* and *because it is property,* and not on "the business of transportation," not a tax on "freight carried, because carried;" neither is it a tax on the "consignor, or consignee of the freight, * * * because the freight is transported;" but it is a tax on persons who mine, and own the coal, because the coal, the franchises, and estates of the parties, constitute property in the State, and like any other kind of property and estates, should be made to contribute to the burdens of government.

*Julian I. Alexander* and *John P. Poe,* for the appellee.

The Act of 1872, ch. 274 is unconstitutional.

1st. Because it is repugnant to the Constitution of the United States,—and

2nd. Because it is repugnant to the Constitution of the State of Maryland.

1st. It is in plain conflict with that provision of the Federal Constitution, which ordains that "Congress shall have power to regulate commerce with foreign nations, and among the several States." The recent decision of the Supreme Court of the United States in the case of the *Pennsylvania State Freight Tax,* 15 *Wallace,* 232, reported since the judgment of the Court below, clearly establishes this proposition.

The Pennsylvania State law is almost identical with the Act of 1872. The Supreme Court of Pennsylvania held it to be constitutional, but the Supreme Court of the United States reversed that decision, and declared that a

statute of a State imposing a tax upon freight taken up within the State and carried out of it, or taken up without the State and brought within it, is repugnant to that provision of the Constitution of the United States, which ordains that " Congress shall have power to regulate commerce with foreign nations and among the several States, and with the Indian Tribes."

By the terms of the Maryland Act, the tax is sought to be levied upon all coal mined and sent to market in this State or elsewhere, and the declaration alleges that the very coal upon which this tax is claimed, was received by the appellee upon "its cars for transportation immediately from the mines, out of which it was produced, to sundry points, to wit, in said State and elsewhere." The decision of the Supreme Court covers this case, and therefore this law should like the Pennsylvania statute, be held to be unconstitutional and void. *See Passenger Cases,* 7 *Howard,* 283 ; *License Cases,* 5 *Howard,* 504 ; *Almy vs. State of California,* 24 *Howard,* 169 ; *Woodruff vs. Parham,* 8 *Wallace,* 123.

2nd. It is repugnant to the Constitution of Maryland.

Because in connection with an Act passed at the same session, (1872, ch. 419,) and approved on the same day, a double tax is imposed. By chapter 419, a State tax of nineteen cents on each one hundred dollars in value of the shares of the capital stock of any corporation created by this State, or under its laws, is exacted.

This tax is required to be paid to the Treasurer by these corporations annually, *prior to July* 1st *in each year.*

By chapter 274, (the Act under which this suit is brought,) a State tax of two cents per ton upon all coal mined and sent to market in this State or out of it, is attempted to be levied.

This tax the appellee is required to collect from the coal mining companies before it can lawfully receive their coal upon its cars for transportation, and is required also to

pay into the State treasury, in quarterly payments, on the first day of January, April, July and October in each year.

*Both* these taxes must be paid. They are not substitutional, nor in the alternative, but are cumulative. They are imposed upon the same companies, by laws of equal, co-existing and co-incident obligation passed at the same session, approved by the Governor on the same day, and designed by the Legislature to be alike operative, a reference being in fact made in the 7th section of chapter 274 to the provisions of chapter 419.

The mining companies, therefore, who are required to pay to the appellee, as the involuntary collector designated by the Act, the tax of two cents per ton on all the coal they mine and send to market, are likewise required to pay to the Treasurer of the State, a tax of nineteen cents on every hundred dollars of their capital stock, and these two taxes being concurrent and levied for the same period, and by laws equally operative, necessarily amount to a plain and palpable case of double taxation.

A tax upon the capital stock of a corporation is a tax upon its franchise, and upon all its property, real and personal, because the capital stock is the representative of its franchise, and of all the other property held under it. *Gordon vs. Mayor, &c. of Baltimore,* 5 *Gill,* 236 ; *Mayor, &c. of Baltimore vs. Balto. & O. R. R. Co.,* 6 *Gill,* 294.

When the shares of stock, therefore, are taxed, the coal in the mines, which that stock represents, is taxed also, and to tax *both* coal and stock is necessarily to tax the same property twice.

This is clearly prohibited by Art. 15 of our Bill of Rights, " To tax both the real or personal property and the stock would be a double tax, and therefore illegal and unjust." *Gordon vs. The Mayor, &c. of Baltimore,* 5 *Gill,* 236 ; *State vs. Sterling,* 20 *Md.,* 520.

Nor do the provisions of the 7th section of the Act relieve the case of this difficulty. This section provides

"That whenever it shall appear to the Comptroller, by the return of the officers of the said transporting companies, as aforesaid, that any coal mining company in this State has *bona fide* worked its mine, and has paid the tax upon the coal mined by said company, in *accordance* with the provisions of this Act, the said Comptroller shall issue to the said coal mining company a quietus for State taxes on the capital stock of said coal mining company, for the year in which said payment has been made by said coal company as aforesaid, it being the meaning and intent of this Act that said coal mining companies shall not be taxed at the same time on their production of coal, and also on their capital stock, but the tax imposed by this Act shall, when paid, be a discharge of the State tax on the capital stock of said company so paying as aforesaid."

The tax of two cents per ton is to be paid from day to day by the mining companies, as their coal is mined and offered to the appellee for transportation. The tax on the capital stock must be paid by the first of July in each year. The one is paid from day to day by the mining companies to the appellee, as the State's collector. The other is to be paid "to the Treasurer." Now, as until the end of each year, the Comptroller cannot lawfully issue his quietus to the company which shall *bona fide* work its mine, for the plain reason, that until then he cannot know that it has, in fact, so worked it, and as the tax on the capital stock must, by the terms of the law, be due, payable and paid before the quietus can be issued, this provision for such quietus cannot possibly help the case. Of what advantage is a quietus against a tax, which cannot lawfully be issued until after the tax is actually paid?

The Comptroller has no power to dispense with the exactions of either law. He must collect from the corporations the tax on their capital stock by the first of July.

He must collect from the appellee the tax of two cents per ton on the coal mined and transported by it, in quarterly payments, on the first day of January, April, July and October.

It is clear, therefore, that under the operation of these two laws *two* taxes must be paid. The *bona fide* working and regular payment of the tax on coal will authorize *at the end of the year,* a quietus on the tax on the capital stock for the same year, but this last must be paid six months before the quietus can be issued, and of course, therefore, before the quietus can be given both taxes will be in the State treasury, from which they cannot be withdrawn, except by means of a law yet to be passed.

By the plain and express provisions of these two laws the same mining companies are required to pay two taxes upon the same property for the same year, under circumstances which make it impossible that the tax which is to be paid first can be refunded or recovered if the whole of the other tax, as levied, should prove to be regularly paid at the stated quarterly periods.

Manifestly, therefore, the taxation is double, and consequently unconstitutional.

This law is also unconstitutional, because it is a specific tax in violation of the 15th Article of the Maryland Bill of Rights.

Equality of taxation, according to the actual worth of the tax payers in real or personal property, is the principle asserted in this article, to which all our legislation must of necessity conform.

The Legislature cannot lawfully levy taxes for the support of the government upon different classes or species of property, at different rates, without regard to the real values, nor upon one class of property alone. Neither one class of our citizens, nor one species of the property of our citizens, can be selected as the persons or the property upon whom the burden of taxation can be cast. *All* the

property of *all* the people must be fairly assessed, and then *all* this assessed property must be *equally* taxed. Any other principle would enable the Legislature to collect the whole State tax from the owners of any one description of property, which it might capriciously select, and thus to burden one class of people or one species of property, and exempt another class or a different species altogether.

That the tax imposed by this Act is a special tax on property, must be conceded; that it is levied for the support of the government is apparent upon the face of the Act and its title; and that it is destructive of the principle of equality in proportion to actual worth cannot be successfully denied.

It is, therefore, just such a tax as the 15th Article of the Bill of Rights was designed to prohibit. *Mayor, &c. of Baltimore vs. Balto. & O. R. R. Co.*, 6 *Gill*, 291, 292; *State vs. Sterling*, 20 *Md.*, 520; *Tyson, et al. vs. The State*, 28 *Md.*, 587; See also *Cooley on Constitutional Limitations*, 501, 504, 514; *Knowlton vs. Supervisors of Rock Co.*, 9 *Wis.*, 410; *Gilman vs. City of Sheboygan*, 2 *Black*, 510; *City of Zanesville vs. Richards*, 5 *Ohio St. Rep.*, 589; *The People vs. McCreery*, 34 *Cal.*, 433; *Atty. Gen. vs. Winnebago, &c., Plank R. Co.*, 11 *Wis.*, 42; *Bureau Co. vs. Chicago, &c. R. R. Co.*, 44 *Ills.*, 229; *Chicago & N. W. R. W. Co. vs. Boone Co.*, 44 *Ill.*, 240; *Sawyer vs. The City of Alton*, 3 *Scam.*, 127; *Motz vs. The City of Detroit*, 18 *Mich.*, 495; *State of Nevada vs. Eastabrook*, 3 *Nevada*, 173; *State of Louisiana vs. Merchants Ins. Co.*, 12 *La. Ann.*, 802; *Adams vs. Mayor, &c. of Somerville*, 2 *Head, (Tenn.,)* 363; *Crow, et al. vs. The State of Missouri*, 14 *Missouri*, 237; *Stevens & Woods vs. State*, 2 *Ark.*, 299; *Society for Savings vs. Coite*, 6 *Wall.*, 594; *Provident Institution vs. Massachusetts*, 6 *Wall.*, 611; *Hamilton Company vs. Mass*, 6 *Wall.*, 632.

The collateral inheritance tax is not a tax on property, but is rather the price exacted by the State from the col-

lateral representatives of a deceased person, for the waiver of its right as a sovereign to possess itself of the property of such deceased person, or as the condition upon which they shall be permitted to inherit it.

Stamp taxes are not a tax upon property within the meaning of the first clause of the 15th Article of the Bill of Rights. They are merely governmental regulations as to the form of contracts, and the nature of the evidence necessary to the admissibility of certain written instruments.

Licenses are not taxes upon property, but are merely the price of a privilege, permission or authority granted by the State to certain persons or classes of persons to carry on within its borders, certain occupations, business employments, trades or professions. They are police regulations designed primarily for political purposes, and though incidentally sources of revenue, yet are not issued originally with that view. *Williams' Case*, 3 *Bland*, 257.

Neither licenses, stamp duties, excise duties, fines or the collateral inheritance tax can be regarded as furnishing any ground for this tax upon coal—for they all stand upon principles entirely in harmony with the constitutional restriction relied on as prohibitory of this particular tax.

Alvey, J., delivered the opinion of the Court.

The only question intended to be presented by this appeal, and which has been argued in this Court, is, whether the Act of the Legislature of 1872, ch. 274, is constitutional or not. All other questions arising on the pleadings have been waived, and the issue of fact disposed of by agreement.

The Act in question, is entitled "An Act to regulate the taxation of Coal Mining Companies in this State, for State purposes."

By the first section it is provided, "That it shall not be lawful for any Coal Mining Company or association in

this State, *to transport any coal mined in this State,* on any railroad, canal, or by any boat or vessel, *from any mine in this State, to any place in this State or elsewhere,* for sale, until a State tax of two cents per ton of two thousand, two hundred and forty pounds, *on said coal,* be first paid to the railroad company, canal company, or transportation company, undertaking to transport the same immediately from the said mine, or payment of the same be provided for, to the satisfaction of the said company undertaking to transport the same as aforesaid.'' And the second section makes it unlawful for any transportation company, doing business in this State, to receive any coal mined in this State for transportation, immediately from the mine out of which the same may be produced, to any point in this State or elsewhere for sale, until the tax of two cents per ton shall be first paid by the party mining the same, to the transportation company; and every transportation company receiving coal so mined for transportation, shall be liable to the State for such tax; and it is expressly made the duty of the transportation company transporting the coal, to collect the tax before receiving the coal for transportation.

The third section makes it the duty of the financial officers of the transportation companies, so receiving coal for transportation, to make returns in writing to the Comptroller of the Treasury, within thirty days after the first day of January, April, July and October of every year, stating fully and particularly the number of tons of coal mined in this State, and transported on or over their works, for the three months immediately preceding each of the above mentioned days; and it is made the duty of such transporting companies, at the time of making such returns, to pay into the treasury of the State, the tax so by them required to be collected.

The fourth, fifth and sixth sections provide penalties for failure or neglect by the transportation companies, or

their officers, to collect and pay over the tax as directed by the Act, and as to the manner of suing, the extent of recovery, and the enforcement of the judgment.

By the seventh section, it is provided that whenever it shall appear to the Comptroller, by the returns of the officers of the transportation companies, that any coal mining company in this State has *bona fide* worked its mine, and paid the tax upon the coal mined by it, in accordance with the requirement of the Act, the Comptroller shall give such company a discharge for State taxes on its capital stock for the year in which such tax on the coal mined has been paid; it being declared to be the meaning of the Act that such mining companies shall not be taxed at the same time on both their production, and their capital stock.

The eighth section clothes the Comptroller with power to examine the officers of the several transportation companies, and other persons, under oath, as to the amount of coal mined and transported, and provides a penalty for refusing to be sworn to give information.

The Act was made to take effect from the day of its passage, and was approved on the 1st of April, 1872.

The present suit was brought under this Act by the State against the appellee, the defendant; the latter being a transportation company, engaged in transporting the coal mined in Allegany County, directly and immediately from the mines, thence to be put in course of transportation to the various markets of the country for sale; the amount in controversy, and for which the action is brought, being the alleged amount of tax on the coal transported by the defendant from the date of the Act, to and including the thirtieth of June, 1872, and the penalty of ten per cent. on the amount of the tax alleged to be due.

The question of the constitutionality of the Act is raised by a demurrer, and though interposed by the State to the second plea of the defendant, it brings before the Court the sufficiency of the declaration as well as the plea.

The declaration discloses upon its face the fact that the claim of the State against the defendant, arises solely under the Act just recited, and hence the question of the validity of the Act is fully presented by the demurrer.

The validity of the Act is called in question upon two distinct grounds ; first, that it is in conflict with the Constitution of the United States ; and, secondly, that it is in conflict with the Constitution of this State.

Preliminary to the consideration of these questions, it is proper to say, that the taxing power of the State is of vital importance to it ; indeed, so essential is the power, that the very existence of the State depends upon the right to exercise it. All persons and property, therefore, within the jurisdiction of the State are liable to it ; and the power is conferred upon the State for the benefit of the entire body politic. The power resides in the State as an attribute of its sovereignity, and the right of the Legislature, as the representatives of the people, to exercise it, should never be questioned, except in plain cases, where, the power is relinquished for valid consideration, or where to prevent its abuse, it has been placed under restriction, either as to the subjects liable to it, or the mode and manner of its exercise.

That the State's power of taxation has been restrained and made subject to limitation by the Federal Constitution, as to certain subjects, is clear, and it is equally clear, that, with respect to the mode and manner of exercising the power by the Legislature, it has been restrained by the Constitution of the State.

1. Proceeding then to consider the questions immediately involved in this case, the first is, whether the tax upon coal, imposed by the Act of 1872, chapter 274, is repugnant to, or in violation of that provision of the Constitution of the United States, which declares that " Congress shall have power to regulate commerce with foreign nations, and among the several States."

With respect to this question, it is to be observed that the Act imposes the tax of two cents per ton upon all coal mined in the State, and transported by any of the ways enumerated, to any point in the State or *elsewhere,* for sale. By the regular course of the coal trade of the State, as is well known as matter of public concern and notoriety, much the larger portion of all the coal mined in this State is transported without change of ownership directly from the mines, either to points beyond the State, or to points within the State, to be shipped for markets beyond the State limits. The Act, however, imposing the tax, makes no discrimination between that portion of the coal that may be transported to places within the State for sale, and that portion transported beyond the State for sale. All coal mined in the State and transported, whether in or beyond the State, is taxed alike.

Of course, it is not pretended that the clause referred to of the Constitution of the United States has any application, or creates any restriction, as to the tax imposed on the coal transported for sale exclusively within the State. The internal commerce of the State is exclusively within her control, and is liable to such taxation as the Legislature may think proper to impose upon it, provided there be no restriction in the State Constitution. But, in regard to the tax now under consideration, it is imposed directly upon the coal transported, and only that transported for sale; and as to all such portion of the coal as may be transported directly from the mines to places or markets beyond the limits of the State for sale, the tax would plainly appear to be an interference with and a restriction on inter-State commerce, and hence in contravention of that provision of the Federal Constitution which gives to Congress the power to regulate commerce among the several States.

Indeed, we are not left to construction or speculation as to this question. It has been recently before the Supreme

Court of the United States, and has been there decided in a case so entirely analogous to the present, that we are relieved from doing more than to state the nature and ruling of that case.

The case referred to is that of *The Reading R. Co. vs. State of Pennsylvania*, 15 *Wall.*, 232. There the Act of the State of Pennsylvania imposing the tax, contained many of the provisions that are found in the Act now under consideration. The Pennsylvania Act required the officers of the transportation companies of that State, to make returns to the auditor-general of the number of tons of freight carried over, through, or upon the works of such companies, for the three months immediately preceding the first days of January, April, July and October of every year; and the several companies were required, at the time of making such returns, to pay to the State treasurer, for the use of the State, certain rates of tax per ton on each ton of freight carried; the rate on coal being two cents per ton, the same as prescribed by the Act before us. The Act of Pennsylvania, in an action by the State for the recovery of the tax, was held to be valid and in all respects constitutional, by the Supreme Court of that State, notwithstanding it imposed a tax upon freight, taken up within the State, and carried out of it, or taken up without the State and brought within it. But on writ of error, the Supreme Court of the United States decided otherwise, and held the Act to be repugnant to the provision of the Constitution of the United States which we have before referred to, so far as it operated to tax inter-State commerce; and it was held that the transportation of freight, the subjects of commerce, is a constituent of commerce itself, and that a tax upon freight, transported from State to State, is a regulation of commerce among the States.

In that case, a question was made and much discussed, as to the nature of the tax, and upon what it was really and

substantially imposed. On the one side, it was contended that it was simply a tax upon the franchises of the carrying companies, or upon their business, measured by the number of tons of freight carried. While on the other side it was contended, that the tax was laid upon the freight carried, and not at all upon the carrying companies; and in accordance with this latter proposition was the opinion of the Court. The question arose from the ambiguity of the statute. But in the case before us there is no such question. The Maryland Act has made plain what the Court had to arrive at, in deciding upon the Pennsylvania Act, by inference and construction. Here the tax, by the very terms of the Act, is imposed upon the coal transported, and only upon such as may be transported for sale, and the carrying companies are, in terms, made tax collectors for the State.

The Supreme Court, in the case referred to, after concluding as to the nature of the tax, and that it was really, though not in terms, imposed upon the freight carried, say that beyond all question the transportation of freight, the subjects of commerce, for the purpose of exchange or sale, is a constituent of commerce itself; and that this is a proposition that has never been doubted. They then ask, "why is not a tax upon freight transported from State to State a regulation of inter-State transportation, and, therefore, a regulation of commerce among the States? Is it not prescribing a rule for the transporter, by which he is to be controlled in bringing the subjects of commerce into the State, and in taking them out? The present case," they continue, "is the best possible illustration. The Legislature of Pennsylvania has in effect declared that every ton of freight taken up within the State and carried out, or taken up in other States and brought within her limits, shall pay a specified tax. The payment of that tax is a condition, upon which is made dependent the prosecution of this branch of commerce. And as there is no limit to

the rate of taxation she may impose, if she can tax at all, it is obvious the condition may be made so onerous, that an interchange of commodities with other States would be rendered impossible. The same power that may impose a tax of two cents per ton upon coal carried out of the State, may impose one of five dollars. Such an imposition, whether large or small, is a restraint of the privilege or right to have the subjects of commerce pass freely from one State to another, without being obstructed by the intervention of State lines." And in concluding their opinion, the Court say that "transportation is essential to commerce; and every burden laid upon it is *pro tanto* a restriction. Whatever, therefore, may be the true doctrine respecting the exclusiveness of the power vested in Congress to regulate commerce among the States, we regard it as established that no State can impose a tax upon freight transported from State to State, or upon the transporter, because of such transportation." In other words, the State has no power to impose a tax upon inter-State transportation, such transportation being a constituent of commerce. This proposition is re-affirmed in the case of *Osborne vs. The City of Mobile,* 16 *Wall.,* 479.

By the Act before us there is a positive prohibition to the transportation of coal "from any mine in this State to any place in this State or elsewhere, for sale," until a State tax of two cents per ton is first paid, or provided to be paid. It is only the coal transported for sale that is the subject of this tax, and therefore it is by reason of the fact of transportation that the coal becomes liable to the tax at all; and it is quite clear that the Act contemplates the transportation of coal as freight beyond the State for sale; and thus the payment of the tax becomes a condition precedent, and consequently an impediment to the prosecution of this branch of commerce. And though the tax be levied upon all coal transported, as well that transported to places within the State, as that transported

beyond its limits, still, that can make no difference in the effect of the law. The State is at liberty to tax her internal commerce, but if an Act to tax inter-State commerce be unconstitutional, it is not cured by including in its provisions subjects within the taxing power of the State. This is explicitly decided by the case in 15 *Wall.*, 276, 277.

Without saying more in regard to this question, we are of opinion, upon the authority cited, that the Act of 1872, chapter 274, so far as it affects to impose the tax upon coal transported from the mines in this State to places beyond the State for sale, is unconstitutional and void.

And having thus declared the Act so far void, as being in conflict with the Constitution of the United States, it becomes a grave question whether the Act in its entirety, irrespective of any other constitutional objection, does not fail. As a general rule, where a statute is partly void, and its provisions all relate to a single subject-matter, the question whether the other parts shall remain operative, depends in a great measure upon a consideration of the object in view in the passage of the Act, and in what manner and to what extent the unconstitutional part affects the remainder. Here we can hardly suppose that the Legislature would have passed the Act in question with a knowledge that it could only be effectual as to the coal transported to places within the State; and thus intentionally have discriminated against the citizens of the State and in favor of those beyond its limits. It would not be fair to indulge such a presumption with respect to the purpose of the Legislature. But, without deciding this question, we shall proceed to consider the second constitutional objection urged to the Act.

2. This question is founded on the 15th Article of the Bill of Rights of this State. It is said that the Act in question is in violation of this Article of the Bill of Rights, because it imposes a specific tax, without regard to the value of the article taxed, and without regard to the prin-

ciple of equality and uniformity prescribed by the Bill of Rights.

The article of the Bill of Rights relied on declares that " every person in the State, or person holding property therein, ought to contribute *his proportion of public taxes for. the support of the Government, according to his actual worth in real or personal property;* yet fines, duties or taxes may properly and justly be imposed or laid with a political view, for the good government and benefit of the community."

This is a fundamental declaration of the right of the citizen against unequal and undue assessments of taxes by the Government. It was not deemed a sufficient guarantee that no tax should be imposed but by the representatives of the citizen in the Legislature, but, in order to prevent abuse of the power, which would otherwise be unlimited, the Legislature is required to cause all public taxation for the support of the Government to be fair and equal in proportion to the value of the property assessed, so that no class or species of property shall be unequally or unduly taxed. And this declaration of the right of the citizen is not simply directory to the Legislature, to be observed or not as that department of the Government may determine or think proper ; but it is a positive limitation or restriction on the power, and whenever it is transcended or disregarded, it becomes the duty of the Courts to declare the Act void. Hence, this Court has repeatedly declared that taxes, if imposed in violation of this fundamental rule, would be illegal and void. In the case of the *Mayor & City Council vs. Balto. & Ohio R. R. Co.,* 6 *Gill,* 291, the Court, in referring to a tax on the franchise of an incorporated bank, say, if it were a special tax, technically speaking, levied for the support of the government of the State, it would be clearly unconstitutional and void, as being repugnant to the 15th Article of the Declaration of Rights. And in another part of the same opinion the

Court say: "The argument is wholly unsound when applied to Maryland, that a franchise, if subject to taxation, may, by its excessive exercise be destroyed or rendered valueless; because by the 13th, (now 15th) Article of the Bill of Rights, the Legislature can impose no tax upon it, *which is not equally borne by every other species of property in the State* in proportion to its value." And language equally decisive, has been used in other cases; as in the case of the *State vs. Sterling,* 20 *Md.,* 520; and also that of *Tyson vs. The State,* 28 *Md.,* 587.

In construing this declaration of right, however, the terms employed can only apply to a *direct* tax on property, and not that the power of the Legislature should be limited as to the objects of taxation. The restriction is only intended to prevent an arbitrary taxation of property according to kind or quality, without regard to value. *Sedg. on St. Law,* 557. There are many other species of taxes that have been imposed from the foundation of the State goverment to the present time; and a power so long exercised unquestioned, could only be doubted upon the most conclusive argument against it.

What then is the character of the tax imposed by the Act in question? It is, beyond all doubt, a direct and specific tax upon coal, and therefore a tax upon property. It is not assessed with reference to any uniform value of the coal, nor with reference and in conformity to any rate of taxation imposed upon the other property of the State. It is therefore a specific, arbitrary tax levied for the support of the government, on a part of the personal property of the State, without regard to value, uniformity or equality. Upon the same principle that this tax of two cents per ton is attempted to be imposed, if legal, the State could impose fifty cents, or even a dollar per ton on all the coal mined and transported.

Now, the capital stock of the several mining companies of the State is liable to taxation according to a fixed and

certain rate; and the stock being the representative of the whole property of the corporation, the payment of the tax on the capital stock exempts from taxation all the property both real and personal of the company. And although the State may elect to tax either the capital stock, or the real and personal property of the company, yet it cannot tax both; and if it elect to tax the real and personal property, and not the stock, such property must be assessed according to the same equal and uniform rate, in proportion to its value, as all other property in the State, whether owned by individuals or corporations. It is not competent to the Legislature to discriminate as between the different species of property, and to tax some by one rule and some by another. All must bear the burthen alike; for if it were otherwise, it would be impossible to observe the rule, which requires that every person in the State, or person holding property therein, shall contribute his proportion of public taxes for the support of government, *according to his actual worth in real or personal property.* The protection afforded by the rule, consists in the equality and uniformity required, whereby one person shall not be taxed more nor less than another, because he may happen to own a different species of property from that owned by the other. Hence, the Legislature could not do what was attempted to be done by the Act under consideration; for although the State might elect to tax the property of the coal companies rather than their capital stock, yet the entire tax exacted from them could not be, in the shape of a special tax, laid exclusively upon one species of personal property, namely, their coal mined for transportation. Such legislation most clearly violates the Article of the Bill of Rights to which we have referred; and so declaring, we shall affirm the judgment of the Court below.

*Judgment affirmed.*

(Decided 5th March, 1874.)

STEWART, BOWIE and ROBINSON, J., dissented, and Judge STEWART delivered the following dissenting opinion:

The only question involved in this appeal is whether the Act of 1872, chapter 274, purporting to regulate the taxation of coal mining companies in this State is a valid exercise of legislative authority? The Circuit Court pronounced the law a nullity, as contravening the fifteenth Article of the Declaration of Rights. The counsel for the appellee now insist that it is repugnant to the Constitution of the United States.

These propositions are novel and startling to me, and if sustained by the authority of this Court, it is clear must create doubt as to the existing legislation of the State, in regard to the revenue, and seriously embarrass the Legislature in devising the means, according to its discretion, by the imposition of taxes, and the collection of the necessary revenue, to sustain the Government, and credit of the State. The 27th, 28th and 30th sections of Article 3 of the Constitution, are provisions showing the grave formality required in the enactment of a law. The 17th section in order to further guard against hasty, partial, or unconstitutional legislation, and encroachment upon the other departments, confers the qualified veto power upon the Governor. Every bill, before it can become a law, must have his sanction, not as a matter of mere form, but of substance ; or be passed by three-fifths of all the members elected to each House. The law in question having been enacted under all the forms required by the Constitution, by the Legislative branch, and been approved by the Governor, thus giving it the sanction of two great departments, ought not to be set aside by this Court upon any doubtful theory. The plainest principles of comity demand that every fair intendment should be made to sustain it. All Courts regard it as a grave occasion to justify them in pronouncing a law thus approved, to be of no effect. In the case of *Baltimore vs. State*, 15

*Md.,* 376, it was said by Judge Tuck, delivering the opinion of this Court, "that it was the duty of the Court to give such construction to Legislative Acts as will not bring them in conflict with the Constitution; and it should clearly appear that they cannot be supported by any reasonable intendment, a reasonable doubt will be solved in favor of the Legislative Act, and it will be valid." To the same effect are the cases of the *State vs. R. R. Co.,* 12 *G. & J.,* 400 ; *Cromwell vs. State,* 12 *G. & J.,* 257 ; and *Wright vs. Wright,* 2 *Md.,* 429.

Chief Justice Marshall, in *Fletcher vs. Peak,* 6 *Cranch,* 128, says it is not on slight grounds of implication and vague conjecture that the Legislature is presumed as transcending its powers and its Acts void.

Justice Washington, in *Ogden vs. Sanders,* 12 *Wheaton,* 170, says it is but a decent respect due to the wisdom, the integrity and patriotism of the Legislature by which any law is passed, to presume in favor of its validity; they legislate under the solemnity of an oath, which it is not supposed they will disregard. Chief Justice Shaw, in 16 *Pickering,* 95, says it must be a clear case, beyond reasonable doubt, to invalidate an Act of the Legislature.

It is an apposite remark of Mr. Cooley, in his excellent treatise on Constitutional Law, pages 487, 488, that there are cases of constitutional action by the representatives of the people which cannot be reached, except through the ballot-box; and others, where the line of distinction between that which is allowable or otherwise, is so shadowy, that the decisions of the Legislature must be accepted as final, although the judicial opinion might be different.

The Supreme Court of the United States has always regarded the State power of taxation as essential to its preservation, and in determining questions as to the extent of the power of the State, so far as it might affect her relations with the General Government, has been cautious

not to trench upon the rights of the State in the discharge of this sovereign prerogative. In regard to the welfare of the Union as of the State, that Court has considered this necessary attribute of State sovereignty should not be impaired or extinguished upon any possible repugnancy in the exercise of their respective powers. But so far from this law being of doubtful validity in regard to its alleged conflict with the Constitution of the United States, it appears to me that much argument is required to show that it can upon any reasonable hypothesis be construed as interfering with any of the powers confided to the United States. A brief reference to the character of this law shows its purpose and effect, and enables us to determine, if it is incompatable either with the Constitution of the United States, or the Bill of Rights of this State. The case having been submitted on demurrer, we are confined to the terms of the law as it appears in the record, and which is, no doubt, a literal transcript from the statute book; and what is there upon its face to show it violates any provision of the Federal Constitution? The title of the Act, although no part of the law, may be resorted to, in order to show the intention of the Legislature. This purports to be, to regulate the taxation of coal mining companies; and the seventh section declares the meaning and intent of the Act to be for a like purpose; the other sections provide the necessary means, according to the discretion of the Legislature, to enable the said tax to be collected, by holding the transportation companies liable for the payment of the tax. The evident object of the law, was not to impose a tax upon the transportation of coal, but upon the mining of coal for sale, upon which the Legislature deemed it proper to impose a tax of two cents per ton upon any company engaged therein; otherwise, it was to be taxed upon its property. The Legislature had the power either to impose the *special tax*, upon every ton of coal mined, if it deemed it proper to do so,

or it had the right to tax the *business* of *mining coal* by *corporations* or *individuals*. The State had as much right to do so, as to require the coal dealer elsewhere, to pay a license for the sale of coal, or to pay a certain sum for each ton of coal he might sell. If that company is to be discharged from the payment of this tax, because its imposition interferes with commerce between the States, every item of property in the State, capable of being transported from place to place, would be equally exempt from taxation, because any tax upon it, might, to some extent, be considered as affecting its transportability, and thus conflicting with the right of the United States to regulate commerce between the States. If such construction is to be given to the clause of the Federal Constitution upon that subject, the power of the State will be effectually annihilated. No such authority has ever been claimed, for the United States, by the wildest advocate of Federal power. The Supreme Court, in the recent decision in 15 *Wall.,* found no objection to the tax on gross receipts of railroads, although it might affect inter-State commerce. It conceded the power of the State to impose taxes *ad libitum* upon the property or employment of its citizens. But where the State undertook to tax freight or tonnage on goods merely passing over its highways, that Court held it was imposing a tax upon the property of citizens or non-residents simply passing through the State, and thus interfered with commerce between the States. The law now in question puts no tax on freight or tonnage, but upon the company mining coal in the State for sale. There is no resemblance in the features of the two laws, and according to my apprehension no just deduction can be drawn from the decision adverse to this law. In what possible respect can the imposition of such a tax conflict with the powers of the Government of the United States, either practically or potentially?

The question as to the extent of the power of the State over taxation, in reference to any limitation thereon, con-

sequent upon the delegation of certain general powers to the United States, was very fully discussed by this Court in the case of *Howell vs. State,* 3 *Gill,* 24. It was clearly stated, and which accords with the tenor of the second, third, and fourth Articles of our Bill of Rights, "that it is established that the States hold all the powers which they originally possessed, except those delegated to the United States, or prohibited to the States; that unless the right of the State to tax property like that under consideration, (a tax on vessels licensed by the United States) has been alienated or surrendered, the power to do so remains, and may be exercised. To render a State law unconstitutional, or extinguish a State power, by implication, on the ground that it is repugnant to powers vested in the General Government, the repugnancy must be clear, immediate and direct, and not that which is merely speculative, indirect and contingent; not a mere possibility of inconvenience in the exercise of powers, but an immediate and constitutional repugnancy, that can, by implication, alienate or extinguish a pre-existing right of sovereignty.—The distinction is between an immediate, direct and necessary conflict of powers, where power stands arrayed against power, as in the case of *Gibbons and Ogden;* and one that is merely possible, and often occurs in our form of government, where powers, harmonious in themselves, are seen operating upon the same subject." To the same effect is the fourth rule of interpretation in *Story's Com., section* 447. "In cases of implied limitation or prohibition of power, it is not sufficient to show a possible or potential inconvenience; there must be a plain incompatibility or direct repugnancy, or extreme practical inconvenience, leading irresistibly to the same conclusion."

As we understand the recent rulings of the Supreme Court, there is no conflict between them and former decisions, conceding the power of the State to impose such a tax as that in question. This is rendered more clear by

the decison in the case of the *State Tax on Railway Gross Receipts,* 15 *Wall.,* 284, affirming the right of the State to impose such tax. The Court say that their conclusion resulted from the fact that the law levied a tax on freight as such, and not upon the company. A different construction, carried to its logical result, would completely annihilate the State's power of taxation, under the fallacious idea that it interferes with inter-State commerce. In the more recent case of *Osborne vs. Mobile,* 16 *Wall.,* 479, the Chief Justice refers to the two preceding cases, and disclaims any such meaning. Evidently apprehensive that the judgment might be perverted to the prejudice of the State; and to guard against such construction, takes occasion to announce a pertinent political truth: "That it is as important to leave the rightful powers of the State in respect to taxation, unimpaired, as to maintain the powers of the Federal Government in their integrity." Whenever this attribute of sovereignty, the right of taxation, over such a subject as the one now in question is effectually assailed, upon the ground that it essentially invades the province of the Federal Government, it will be not the less fatal to the one than to the other Government. Such a doctrine will be destructive to both. Certain it is, if such is to be the claim of the Federal Government, the Legislature of a State, without the power of taxation, might as well be abolished. It was correctly stated by Judge STORY in the 444th section of his Commentaries on the Constiution: "according to this mode of construction, the power of taxation in Congress, or the power to regulate commerce, would annul the whole power of taxation of the States; and thus operate a virtual dissolution of their sovereignty; such a proposition has been constantly disclaimed."

But Judge STORY was mistaken in the disclaimer of such authority, if a simple law like this, imposing a tax of two cents per ton upon the mining of coal is to be held void, upon the theory that it interferes with inter-State commerce.

To prevent any misconstruction, the Supreme Court, through its Chief Justice, in the late case, says: "In several cases decided at this Term, we have had occasion to consider questions of State taxation. In one, (State Freight Tax,) we held that the State could not constitutionally impose and collect a tax upon the tonnage of freight. In another, (Tax on Railway Gross Receipts,) we held that the tax upon gross receipts for transportation by railroad and canal companies, chartered by the State, is not obnoxious to the objection of repugnancy to the constitutional provision. The tax on tonnage was held to be unconstitutional, because it was in effect a restriction upon inter-State commerce. The tax on gross receipts was held not to be repugnant to the Constitution, because imposed on the railroad companies in the nature of a general income tax. The difficulty of drawing the line between constitutional and unconstitutional taxation by the State was acknowledged, and has always been, by this Court but; that there is such a line is clear, and the Court can best discharge its duty by determining in each case on which side the tax complained of is." "It is not everything that affects commerce that amounts to a regulation of it, within the meaning of the Constitution. We admitted that the ultimate effect of the tax on the gross receipts might be to increase the cost of transportation, but we held that the right to tax gross receipts, though derived in part from inter-State transportation, was in the general authority of the States to tax persons, property, business or occupation within their limits. That the tax there in question, was no more a tax upon inter-State commerce, than a general tax on drayage would be, because the licensed drayman might sometimes be employed in hauling goods to be transported beyond the limits of the State. We think it would be going too far so to narrow the limit of State taxation."

The same doctrine is held in *Howell vs. State.* The Court say: "Conceding to the United States, to the

fullest extent, the power of regulating commerce, not only foreign, but domestic between the States, the exercise of such power, does not conflict with the right of the State to impose taxes, except in cases where the exercise of the Federal authority and the right of the State do actually conflict." The opinion of Chief Justice MARSHALL, in *McCulloch vs. State of Maryland,* 4 *Wheaton,* 428, is referred to as authority. He says, "Before we proceed to examine the argument advanced by the Counsel of the State of Maryland, and subject it to the test of the Constitution, we must be permitted to bestow a few considerations on the nature and extent of this original right of taxation, which is acknowledged to remain with the States. It is admitted, that the power of taxing the people and their property is essential to the very existence of the government, and may be legitimately exercised on the objects to which it is applicable to the utmost extent to which the Government may choose to carry it. The only security against the abuse of this power is found in the structure of the Government itself. In imposing a tax, the Legislature acts upon its constituents. This is in general a sufficient security against erroneous and oppressive taxation. The people of a State, therefore, give to their Government a right of taxing themselves and their property, and as the exigencies of Government cannot be limited, they prescribe no limits to the exercise of this right, resting confidently on the interest of the legislator, and on the influence of the constituents over their representatives, to guard them against its abuse." "If we measure the power of taxation residing in a State, by the extent of sovereignty which the people of a single State possess, and can confer on its Government, we have an intelligible standard, applicable to every case to which the power may be applied. We have a principle which leaves the power of taxing the people and property of the State unimpaired; which leaves to a State the command of all its resources, and which

places beyond its reach, all those powers which are con-
ferred upon the Government of the United States, and all
those means which are given for the purpose of carrying
those powers into execution. We have a principle which is
safe for the States, and safe for the Union. We are
relieved, as we ought to be, from clashing sovereignty;
from interfering powers; from a repugnancy between a
right in one government to pull down what there is an
acknowledged right in another to build up; from the
incompatibility of a right in one government to destroy,
what there is a right in another to preserve. We are not
driven to the perplexing inquiry, so unfit for the judicial de-
partment, what degree of taxation is the legitimate use, and
what degree may amount to the abuse of the power?'' It
must be admitted that property like that which is now
the subject of examination was originally and before the
adoption of the Constitution of the United States, em-
braced by the taxing power of the State. All property
were legitimate objects of taxation, over which the sove-
reign power of the State extended, because this power is
an incident of sovereignty, and is co-extensive to that
to which it is incident; the power of taxation extends to
all the people of the Government, and embraces every-
thing which may fairly be considered as constituting a
part of the mass of property within the State. This is a
cardinal principle, on the preservation and application of
which, the existence of the State Government depends.

In the case of the *Providence Bank*, 4 *Peters*, 563,
Chief Justice MARSHALL further says, '' that the power
of legislation, and consequently of taxation, operates on
all the persons and property belonging to the body politic—
that it is an original principle which has its foundation
in society itself. It is granted by all, for the benefit of
all. It resides in Government as a part of itself and
need not be reserved when property of any description, or
the right to use it in any manner, is granted to individuals

or corporate bodies. However absolute the right of any individual may be, it is still in the nature of that right, that it must bear a portion of the public burthens; and that portion must be determined by the Legislature. This vital power may be abused; but the interest, wisdom and justice of the representative body, and its relations with its constituents furnish the only security against unjust and excessive taxation, as well as unwise legislation. That the taxing power is of vital importance; that it is essential to the existence of government; are truths which it cannot be necessary to re-affirm. They are acknowledged and asserted to by all. It would seem that the relinquishment of such a power is never to be assumed." See also *Mayor of Baltimore vs. Baltimore and Ohio Railroad,* 4 *Gill,* 292. If there is any doubt of the constitutionality of this law, ought not the State Legislature to have the benefit of such doubt? and that those denying the power should be compelled to invoke the determination of the question by the Supreme Court, as a decision of this Court against the law renders it an absolute nullity, and the State has no power to have such review. Unless that Court whose peculiar province it is to decide such questions, shall unmistakably adjudge this law to be in violation of the Constitution of the United States, I shall hold to what I consider the true constitutional doctrine, the preservation and maintenance of the just authority of this State to pass this law, and to impose within her limits such taxes for the support of the Government, as do not and cannot conflict with any reasonable exercise of the authority of the United States. Neither do I find anything in the terms or spirit of this law repugnant to the 15th Article of the Declaration of Rights.

That Article has been repeatedly examined by this Court, and in no solitary instance, has the power of the Legislature to pass such a law as this been denied.

If we pronounce it a nullity, it will certainly be the very first case.

The main object of the Declaration of Rights was to proclaim certain leading political truths, as infallible axioms in the science of government, according to the American theory—to prescribe boundaries to the several departments thereof, and to establish fundamental rules to guide them. It must, from the nature of the case, deal in generalities, and therefore any limitations upon power, provided by that instrument, are mainly directory, because as a general proposition, the judicial determination, as to their power, extent and operation cannot be afforded. *Crane vs. Meginnis,* 1 *G. & J.,* 472.

The legislative department possesses original authority to pass any law over any subject of legislation within this State, unless restrained by constitutional prohibition, and in the great mass of cases they are the ultimate judges of their own authority. The representatives are amenable to their constituents, the people, and in such cases that consideration and their official oath are the only checks upon them. This Fifteenth Article was not the grant of the taxing power to the Legislature, but a limitation upon that power which it already possessed.

The Fifth Article declares that the inhabitants of Maryland are entitled to the Common Law of England. The British Parliament exercises transcendent and uncontrolled legislative power in virtue of the principles of the common law.

The General Assembly of Maryland, over all subjects of legislation within her limits, would exercise as great and transcendent powers as the British Parliament, within the scope of its authority, if there were no constitutional limitations. It was so stated by Chief Justice CHASE in the case of *Partridge vs. Dorsey,* 3 *H. & J.,* 322, and he quotes Coke and Blackstone as to the extent of parliamentary authority "that the power and jurisdiction of parliament is so absolute that it cannot be confined either for causes or persons within any bounds" that it has "sovereign and

uncontrollable authority in making, confirming, enlarging, restraining, abrogating, repealing, reviving, and expounding, of laws, concerning matters of all possible denominations, ecclesiastical, temporal, civil, maritime or criminal," and that "all mischiefs and grievances, operations and remedies, that transcend the ordinary course of the laws, are within the reach of this extraordinary tribunal." See also *Crane vs. Meginnis*, 1 *G. & J.*, 413.

If the General Assembly of Maryland pass a law oppressive to any one, and against what might be considered natural justice, the only remedy under our system of Government, in the absence of constitutional restraint, is by appeal to the people, who can displace the representatives, occasioning the injury, and select others to repeal the obnoxious law; such remedial power is recognized by the seventh Article of the Declaration of Rights in these terms: "That the right of the people to participate in the Legislature is the best security, and the foundation of all free government; for this purpose elections ought to be free and frequent."

No such power is conferred upon the Courts. It is the duty of the Legislature to enact such laws for the government of the State as to it may seem just, and their authority is unlimited and unfettered by judicial supervision, unless there be a palpable violation of the Constitution. The 14th Article provides that no tax, aid, charge, burden, or fees, shall be levied under any pretence without the consent of the Legislature, necessarily implying its power to do so. The 15th Article prescribes a rule to control the Legislature in the exercise of the taxing power. The limitation provided by this Article from the nature of the case must be mainly directory, and designed to impose its moral restraint upon the consciences of the members of the Legislature affected by their official oath and responsibility to their constituents, and rarely reviewable in any case by the Courts. To show that this is the leading doc-

trine of this Court, and the extreme caution with which it regards any interference with the legislative discretion, we need only repeat what was said in *Waters vs. State,* 1 *Gill,* 308 : "In the argument it is contended, that the tax in controversy (a tax of a specific sum on each county) is one laid for the support of Government.  If it were conceded that this was the fact, we should by no means be prepared to pronounce against it as violating the Bill of Rights. Before such a judgment could be formed, it ought to appear clearly that persons taxable, are not made to contribute according to their actual worth in real and personal property.  We should be bound to presume, in the absence of evidence, that the tax imposed was laid according to the provisions of the Constitution.  There is nothing on the face of the law which indicates that the Legislature adopted an arbitrary rule in the apportionment of the tax, without regard to the constitutional provision on the subject." Before a law imposing a tax of a specific sum on each county for the support of Government can be considered as violating the Bill of Rights, "it ought to appear clearly that the persons taxable are not made to contribute according to their actual worth in real and personal property. In the absence of evidence this Court is bound to presume that such a tax was laid according to the provisions of the Constitution, and that the Legislature may have divided it among the counties, according to the valuation of property in such local jurisdictions, and had such evidence before them as guided their judgment in that particular." The legislative discretion is recognized, and in all cases, in the absence of sufficient data to the contrary, the Court cannot undertake to decide that they have violated their trust.

Taking the 14th and 15th Articles together, it is manifest they were intended to assert as a fundamental rule of legislative action, that persons, as such, without property, were not proper subjects of taxation, but only persons

according to their property; and the latter clause of the 15th Article was inserted from abundant caution to prevent any construction to limit the power of the State to impose such other reasonable taxes according to their discretion, where the purposes of the Government required it.

There certainly was no other reason except this, requiring prohibition to tax *per capita,* or to tax paupers. Nothing could be effected by taxing this latter class, because *ex nihilo nihil fit.* This is clearly manifest from the decision in the case of *Egan vs. Charles County Court,* 3 *H. & McHenry,* 170, where the Legislature had imposed a tax on attorneys, as other occupations, employments, business and officers, have been and still are taxed, and the question was raised there as here, that the Legislature could do no such thing, but the Court affirmed the power of the Legislature to impose the tax on the attorneys. This was an early case, and in a later one—the *Germania vs. State,* 7 *Md.,* 1—this Court decided that the State has the power to tax the amusements of the people, either for the purpose of revenue or as a police regulation. They assert that with the exercise of this power in any particular case the Courts have nothing to do; they fulfill their office when they give effect to the constitutionally expressed will of the Legislative branch. The Bill of Rights is referred to as the authority. This power of the Legislature to impose taxes, as to it may seem just and proper, has in every instance when brought before this Court, been recognized.

In the case of the *Mayor vs. B. & O. R.,* 6 *Gill,* 288, it was announced by this Court as an unquestionable rule, that the right of taxation is never presumed to be surrendered by the sovereign power; and such surrender is never made unless it is the result of express terms or necessary inference. A decision of this Court denying the power of the Legislature to pass this law, virtually extinguishes the discretionary authority of the Legislature over the subject of taxation. In *State vs. Mayhew,* 2 *Gill,* 501, this Court

says, " For the time, manner of payment, and collection of the public taxes, it is the peculiar province of the Legislature to provide. It may make the tax levied, a charge or lien on the property assessed, or its profits, or a personal charge or debt to the owner thereof. A power exercised by the General Assembly from the adoption of the Constitution ought to be almost conclusive evidence of its possession by that body—a contemporaneous construction of the Constitution of such duration ought not to be shaken, but upon the ground of manifest error and cogent necessity."

In *Burgess vs. Pue*, 2 *Gill*, 11, it is stated that the Legislature may delegate the power of taxation to the taxable inhabitants, for the purpose of raising a fund for the diffusion of knowledge and the support of primary schools. Grants of similar powers to other bodies for political purposes, have been co-eval with the Constitution, and no serious doubts have ever been entertained of their validity.

Some objection was made to this law, as imposing an unauthorized duty upon the transportation companies, in making them the collectors of the tax. The Legislature had the right to make them discharge this duty, and to hold them answerable for the payment of the tax imposed and due.

The case of the *State vs. Mayhew*, just referred to, expressly affirms such right.

In the case of the *State vs. Sterling*, 20 *Md.*, 516, as in the case of *State vs. Mayhew*, this undoubted authority of the Legislature is specifically restated in the strongest terms. "The power of the Legislature is recognized not only as to the imposition of taxes, but as to the assessing of the value of property, besides prescribing the details of their collection." What other reasonable construction can be put upon the power of the Legislature to impose taxes according to the value of the property held by a person, with authority to tax that value, unless the provision of the Fifteenth Article is to be considered merely as direc-

tory upon that body, and its conduct not the subject of review by the Judiciary? In the case of *State vs. Sterling*, the Court says, "That the Legislature has power to value any taxable property within the State, and assess thereon a just proportion of the public taxes, cannot be questioned. The exercise of such a power, in conformity with the principle of equality of taxation of taxable values, could, in no legal sense, be a violation of the terms of the Thirteenth Article, which simply declares the liability of persons owning property in the State, to contribute for the support of the Government in proportion to their actual worth in such property. The condition of the liability, that it should be proportional to actual worth, was undoubtedly to prevent abuse of the taxing power, and in that respect, prescribe a general rule, to which all legislative measures for the imposition and collection of taxes, should conform. The duty of ascertaining taxable values, and of assessing and collecting the taxes thereon, necessarily rests in the discretion of the Legislature, and it may perform that duty by its own legislative acts, or through the agency of such officers or tribunals as it may appoint for that purpose. The legislative power to assess and compel the payment of State taxes to be made directly to the State Treasury, without other official assistance, implies power to determine the value of the property to be assessed, and consequently a power of discrimination in selecting and fixing the taxable values. These powers have been so long exercised without objection, that they cannot be brought in question now without contravening the settled policy of the State."

In the effort to collect sufficient revenues for the exigencies of the public service, we find various and repeated evidences of this power of the Legislature to impose taxes upon almost all conceivable subjects. Every variety of scheme which the ingenuity of the representatives in the Legislature could devise, has been resorted to. A general

*ad valorem* tax on property has been imposed, and there have been specific taxes on certain articles; direct and indirect levies have been made; license fees upon those who pursue particular avocations; tolls upon property or persons using the public works controlled by the State; stamp duties; a tax on corporations or companies annually to be paid, in proportion to their stock, or other basis; marriage licenses; fees from ferries; public loans; the vendors of goods at private sale or public auction; upon occupations or employments. *Bode vs. State,* 7 *Gill,* 326. Upon the products of the land and the bounties of the water; upon amusements; litigation; the commissions of officers; the gross receipts of railways. Negro slaves, at one time a large item of property, have been valued, and specifically taxed according to their ages, irrespective of actual worth, in different counties. Upon the transfer by law of property by the death of the owner, a considerable revenue has been raised by the tax on collateral inheritances, decided by this Court to be a valid exercise of power. *Tyson vs. State,* 28 *Md.,* 587. Can there be any doubt that a specific tax might be imposed upon the assignment of property by deed, bill of sale or other conveyance amongst the living?

The Legislature has relieved property from the burdens of taxation; it is within their discretion to do so; whether just and judicious to do so, it is their province to decide; such is now the remarkable exemption of mortgages, releasing from the burden a large mass of property. Whilst some property may thus not be taxed, other items may be taxed twice, or persons may possibly be taxed as the holders of property where they may not be the owners thereof; or the property in fact has no existence. It is impossible to have taxes upon persons on account of their property precisely equal, and if they are to be considered void if not so, the Legislature cannot practically devise the means to support the Government. The fundamental rules to

direct the action of the Government, and its practical administration, must have such reasonable and natural construction as the nature of the case requires. Mathematical precision cannot be applied to them. In the assessment of property, with every possible effort to have uniformity of value, it is not within the compass of human ability to accomplish more than approximation to equality of taxation. Any attempt of the Courts to establish a standard other than the one prescribed in the Declaration of Rights, would be nugatory. That each person upon the same description of property ought to pay an equal tax, nobody will question; but if such is not the case, by what mode can the Courts undertake to apply the remedy? The Declaration of Rights does not require the Legislature to collect her revenues by taxes on property. They may be raised otherwise, or taxes may be imposed partly upon property and partly in other modes. Notwithstanding the express provision of the Declaration of Rights against poll taxes, the practice sanctioned by law of compelling persons to work upon the public roads and highways has prevailed from the foundation of the Government. Who doubts the authority to compel this service under the latter clause of the fifteenth Article? The Constitution of Illinois, Article 9, section 2, provides that the mode of levying a tax shall be by valuation, so that every person and corporation shall pay a tax in proportion to the value of the property held in possession. In *Sawyer vs. City of Alton,* 3 *Scam.*, 130, in regard to this provision, the Court say: "The framers of the Constitution intended to direct a uniform mode of taxation on property, and not to prohibit any other species of taxation, but to leave to the Legislature the power to impose such other taxes as would be consonant to public justice, and as the circumstances of the country might require. We cannot believe they intended that all the public burthens should be borne by those having property in possession, wholly exempting the rest of the

community, who by the same Constitution were made secure in the exercise of the rights of suffrage and all other immunities of the citizen." In the *State vs. North*, 27 *Missouri*, 414, the Court decide that the Constitutional requirement of equality extends to such objects of taxation as the Legislature shall determine to be properly subject to the burden. The came conclusion was reached in the case of the *People vs. Coleman*, 3 *Cal.*, 46. The power to determine the persons and the objects to be taxed is intrusted exclusively to the Legislative department.. *Wilson vs. Mayor of New York*, 4 *E. D. Smith*, 675.

Notwithstanding a requirement that the rate of taxation shall be uniform, the Legislature may levy specific taxes on corporations, and exempt them from municipal taxation. *Kneeland vs. Milwaukee*, 15 *Wisconsin*, 454.

The universal acquiescence in the exercise of this discretionary power as to taxation by the Legislature, ought to estop the Courts from questioning its legitimate employment, unless no question is to be considered settled, but all matters pertaining to the action of the Government to be forever debatable.

Constitutional exposition by all parties; acquiescence by enlightened Courts through a long series of years, place the practice upon a foundation of authority which can not be shaken, without delivering over the subject to perpetual and irremediable doubts. 12 *Wheaton*, 190.

In the case of *Watkins vs. Watkins*, 2 *Md.*, 356, it was said by Chief Justice LEGRAND, "that in all human contrivances confidence must be reposed somewhere, and that under the distribution of the powers of Government in our State, it is not given to the Judiciary to compel action on the part of a co-ordinate branch of the Government." Judge STORY, in his Commentaries, sec. 456, refers to an admirable remark of Burke, which cannot be too often repeated, "that those called upon to interpret a Constitution should always bear in mind that Government is a

practical thing, made for the happiness of mankind, and not to furnish a spectacle of uniformity to gratify the schemes of visionary politicians.'' A large and almost unbounded discretion must be lodged in some department of the Government, which is here the Legislative Branch.

Believing the uniform practice of our predecessors to have been conformable to this theory and construction of our Declaration of Rights, and no reason, from the nature of this law, to justify the Circuit Court in pronouncing it a nullity, I think its judgment ought to be reversed.

ROBINSON, J., filed the following dissenting opinion:

I am obliged to enter my dissent in this case. The Act of 1872, ch. 274, imposing a tax of two cents on every ton of coal mined in this State for transportation, is not, in my opinion, in conflict with Article 1, section 8, sub-section 3 of the Constitution of the U. States, which confers upon Congress the power to regulate commerce with foreign nations and among the several States; nor is it in conflict with the Constitution of this State, which declares ''that every person in the State, or person holding property therein, ought to contribute his proportion of public taxes for the support of the Government, according to his actual worth in real or personal property; yet fines, duties, or taxes may properly and justly be imposed or laid with a political view for the good government and benefit of the community.'' Art. 15, Declaration of Rights.

If, however, it be in conflict with the Constitution of this State, as the majority of this Court have decided, then it was altogether unnecessary, in my judgment, to have decided whether it was in conflict with the Constitution of the United States.

Upon no one clause of the Constitution of the United States have the Judges of this country, both Federal and State, differed so widely in regard to its construction, as

the one which confers upon Congress the power to regulate inter-State commerce, and I cannot but regret that a *bare* majority of this Court should have deemed it proper to commit this Court to a construction of this clause, when such construction was not necessary to the decision of the case under consideration.